Mary Cochenour
Cochenour Law Office, PLLC
7 West 6th Avenue, Suite 4I
P.O. Box 1914
Helena, MT 59624
(406) 422-8716
mary@cochenourlawoffice.com

Jenny Harbine
Emma Shahabi
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699 | Phone
(406) 586-9695 | Fax
jharbine@earthjustice.org
eshahabi@earthjustice.org

*Counsel for Plaintiff American Prairie*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| AMERICAN PRAIRIE FOUNDATION, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and STEVAN PEARCE, in his official capacity as Director of the United States Bureau of Land Management, <br><br> *Defendants.* | Dkt. No. CV-26-282-GF-BMM <br><br> **AMERICAN PRAIRIE'S BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION OR STAY** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

I.    AMERICAN PRAIRIE'S BISON GRAZING PERMITS ............................ 2

II.   BLM'S PRIOR DEFENSE OF AMERICAN PRAIRIE'S FEDERAL
      GRAZING PERMITS ................................................................................ 5

III.  BLM'S TERMINATION OF AMERICAN PRAIRIE'S GRAZING
      PERMITS ................................................................................................. 5

LEGAL BACKGROUND ................................................................................... 8

I.    TAYLOR GRAZING ACT ........................................................................ 8

II.   FLPMA AND PRIA ................................................................................. 9

STANDARD OF REVIEW ................................................................................ 10

ARGUMENT ................................................................................................... 11

III.  AMERICAN PRAIRIE IS LIKELY TO SUCCEED ON THE
      MERITS ................................................................................................. 12

      A.    BLM's 2026 Final Decision Violates the Taylor Grazing Act. .......... 12

      B.    BLM's Final Decision is Arbitrary and Capricious in Violation
            of the APA. ................................................................................. 16

IV.   AMERICAN PRAIRIE WILL SUFFER IRREPARABLE HARM IF
      INJUNCTIVE RELIEF IS NOT GRANTED ........................................... 20

      A.    BLM's Decision Causes Irreparable Financial Harm to
            American Prairie ......................................................................... 22

      B.    BLM's Decision Will Cause Genetic Harm to American
            Prairie's Bison. ........................................................................... 24

      C.    BLM's Decision Will Physically Harm Bison. ................................ 25

V.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING RELIEF ..........................................................26

CONCLUSION ........................................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................10

*All. for the Wild Rockies v. Pena*,
865 F.3d 1211 (9th Cir. 2017) ...................................................................11

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ...................................................................20

*Bittner v. United States*,
598 U.S. 85 (2023).............................................................................13, 16

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ...............................................................20, 23

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).............................................................................18–20

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).................................................................................17

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ...............................................................10–11

*Immigrant Defs. Law Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ...................................................................10

*Jama v. Immigr. & Customs Enf't*,
543 U.S. 335 (2005).................................................................................13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)........................................................................11–12, 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................................16, 18

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ...................................................................20

*Public Lands Council v. Babbitt*,
  529 U.S. 728 (2000) ..................................................................................13

*Roman v. Wolf*,
  977 F.3d 935 (9th Cir. 2020) ...................................................................25

*Sierra Club v. Bosworth*,
  510 F.3d 1016 (9th Cir. 2007) ...........................................................21, 24

*Singh v. Clinton*,
  618 F.3d 1085 (9th Cir. 2010) .................................................................12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ...................................................................10

*W. Watersheds Project v. Kraayenbrink*,
  538 F. Supp. 2d 1302 (D. Idaho 2008), *aff'd* 632 F.3d 472 (9th Cir.
  2011) ...........................................................................................................8

*Washington v. U.S. Dep't of Educ.*,
  807 F. Supp. 3d 1275 (W.D. Wash. 2025), *appeal dismissed,* No.
  25-7157, 2026 WL 395718 (9th Cir. Jan. 14, 2026) ...........................21

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ........................................................................10, 25, 28

### STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 706(2)(A) ..............................................................................11, 12

43 U.S.C. § 315a ...........................................................................................8
  § 315b .................................................................................8, 12, 14–15
  §§ 1701 *et seq.* .....................................................................................9
  § 1702(c) ................................................................................................9
  § 1752(a) ..............................................................................................14
  §§ 1901 *et seq.* .....................................................................................9
  § 1902(a) ..............................................................................................14

### STATE STATUTES AND LEGISLATIVE MATERIALS

Mont. Code Ann. § 81-1-101(4) ..................................................................15
  § 81-1-101(6) ........................................................................................15

iv

## REGULATIONS AND ADMINISTRATIVE MATERIALS

43 C.F.R. § 4.21(b) ....................................................................................................7

§ 4.171(e) ........................................................................................................7

§ 4.174 ..............................................................................................................7

§ 4.174(b) ........................................................................................................7

§ 4110.1(a) (2005) ........................................................................................8

43 Fed. Reg. 29067 (July 5, 1978) ....................................................................8

43 U.S.C. § 1702(h) .............................................................................................9

§ 1901(a)(1) ....................................................................................................10

§ 1901(a)(3) ....................................................................................................10

## OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024) ....................................................14

v

**INTRODUCTION**

American Prairie seeks this Court's immediate intervention to prevent imminent and irreparable harm caused by the United States Bureau of Land Management's (BLM) decision to terminate the organization's longstanding grazing permits. BLM's Final Decision orders American Prairie to remove almost 1,000 bison from federal allotments by September 30, 2026, ending more than twenty years of bison grazing on the public lands. Absent injunctive relief, American Prairie will not only lose its ability to graze bison on the federal allotments, it will also suffer immediate harm to the genetic viability of its two bison herds, compromise the herds' health, upset its business relationships, and inflict significant and unrecoverable financial loss. These irreversible harms will deprive American Prairie of its capacity to fulfill its mission and undo decades of stewardship on Montana's shortgrass prairie.

Preliminary injunctive relief is necessary to minimize harm and maintain status quo pending this Court's full judicial review of BLM's decision to cancel American Prairie's grazing permits. Further, a temporary restraining order is necessary to prevent harms from continuing while this Court decides the request for injunctive relief.

1

**FACTUAL BACKGROUND**

## I.    AMERICAN PRAIRIE'S BISON GRAZING PERMITS

Plaintiff American Prairie has grazed bison on BLM lands in Phillips County since 2005. Relying on BLM's approvals for more than twenty years, the Montana-based nonprofit has carefully grown its two bison herds to almost 1,000 animals—the magic number "needed for long-term evolutionary potential." ECF No. 4 Heidebrink Decl., Attach. C, ¶ 16 [hereinafter Putnam Decl.]. Reaching this genetic milestone has taken decades of thoughtful management with American Prairie sourcing animals from Canada, South Dakota, Iowa, and Montana. ECF No. 4 Heidebrink Decl. ¶ 30. American Prairie's bison, which graze today on three federal allotments north of the Missouri River, "are uniquely genetically valuable" and have become one of the "[v]ery few conservation herds in North America…positioned to reach that scale" of 1,000 animals. Putnam Decl., ¶¶ 10, 17.

But, on May 8, 2026, BLM abruptly terminated American Prairie's bison grazing permits, "remov[ing] the pathway to a herd size at which these animals could carry the species' genetic variation without perpetual dependence on importation from other herds." *Id*. ¶ 17. The bison, whose presence has significantly improved rangeland conditions, must now be removed from federal lands within their native ecosystem by September 30, 2026. ECF No. 4 Heidebrink

2

Decl. ¶ 64; *id.* Attachs. E, F (BLM, Montana DNRC field assessments); ECF No. 5-2 Cochenour Decl., Attach. B at 3-24 (BLM 2022 Environmental Assessment, documenting improvements in riparian areas, channel stability, and increase woody species); ECF No. 5-1 Cochenour Decl., Attach. A, 2026 Final Decision at 8 [hereinafter 2026 Final Decision].

BLM's reasoning for cancelling the permits rests on the agency's spontaneous reinterpretation of the 1934 Taylor Grazing Act (TGA), a statute that it had consistently interpreted as allowing conservation bison to graze on public lands. Far from rational, BLM's explanation for its change-of-heart is divorced from the statutory text and unmoored from the evidence before it. BLM simply changed its mind on the TGA and, without consideration of the reliance interests the agency engendered over the last two decades, ordered the bison removed in less than five months.

BLM first granted bison-grazing approvals to American Prairie for the Telegraph Creek and Box Elder allotments in 2005 and 2008, respectively. 2026 Final Decision at 2. In 2022, BLM expanded its authorization to a total of six allotments: Telegraph Creek, Box Elder, Whiterock Coulee, Flat Creek, French Coulee, and Garey Coulee allotments. *Id*. at 1.

Vetted by extensive public comment and an 180-page environmental analysis, BLM's 2022 decision was rooted in the agency's decades-old policy that

American Prairie's bison grazing was "consistent with the authorities in the Taylor Grazing Act." ECF No. 5-2 Cochenour Decl., Attach. B at 1-4. BLM has long recognized American Prairie as a qualified grazing applicant under, 43 C.F.R. § 4110.1, by owning base property and being a Montana corporation. *Id*.

Despite BLM's long-standing grazing approvals, Montana and certain livestock interests administratively appealed American Prairie's 2022 bison grazing permits. 2026 Final Decision at 2. They argued that the TGA allowed only production-oriented animals on public lands. The Department of Interior, Office of Hearings and Appeals, Departmental Cases and Hearings Division (DCHD), in denying their requests for stay, noted their "spirited arguments" related to the TGA, but found that the parties had "failed to marshal facts or legal authority to show that these inadequacies would be successful in a merits review." ECF No. 5-5 Cochenour Decl., Attach. E, DCHD Order Den. Stay at 20 (Oct. 13, 2022). The appellants also failed to demonstrate likely, immediate, and irreparable harm by bison grazing on the federal lands. *Id*. at 41. The Interior Board of Land Appeals (IBLA) affirmed DCHD's order denying stay, finding, in part, that the State's concerns about bison grazing were undermined by the fact that bison were already grazing without incident on state and federal allotments. ECF No. 5-6 Cochenour Decl., Attach. F, IBLA Order at 17–18 (May 29, 2024).

4

## II. BLM'S PRIOR DEFENSE OF AMERICAN PRAIRIE'S FEDERAL GRAZING PERMITS

Throughout the administrative appeals, BLM steadfastly defended its 2022 Final Decision that authorized American Prairie to graze bison on the federal allotments. ECF No. 5-7 Cochenour Decl., Attach. G (BLM administrative pleadings). BLM firmly rejected the imposition of a production requirement for American Prairie's grazing permits, explaining:

> Appellants' requirement of "production" would read words and requirements into the TGA and its implementing regulations that are notably absent. The TGA allows BLM to issue permits to any "stock owner." 43 U.S.C. § 315b. BLM's grazing regulations do not use the word "production" in relation to a qualification for holding a grazing permit. Nor do they require a system whereby BLM should evaluate what a livestock owner's subjective plans might be for the livestock grazing public lands. In other words, Appellants' interpretation is not required by the TGA or implementing regulations ….

*Id*. at pdf p. 146, BLM Summ. J. Br. at 24 (Sept. 29, 2023); *see also id.* at pdf p. 1–124 (same).

## III. BLM'S TERMINATION OF AMERICAN PRAIRIE'S GRAZING PERMITS

On February 1, 2025, the Department of Interior's administration changed and, with it, BLM's policy regarding the TGA and American Prairie's bison-grazing permits. On February 3, 2025, with the administrative appeals fully briefed and pending a decision, BLM filed a Motion for Voluntary Remand of the 2022 Final Decision to allow the "new executive administration an opportunity to further

consider the Final Decision and determine whether it will implement changes or a full withdrawal of the Final Decision." ECF No. 5-8 Cochenour Decl., Attach. H., BLM Mot. for Remand at 2. Before the DCHD ruled on BLM's remand motion, Interior Secretary Burgum assumed jurisdiction of the appeals and remanded the 2022 Final Decision to BLM for reconsideration. Dkt. Nos. 5-9, 5-10, Attachs. I, J (Sec'y Memo (Dec. 9, 2025), Sec'y Order Grant. Mot. for Remand (Dec. 15, 2025)).

On remand, BLM issued a Proposed Decision to cancel American Prairie's grazing permits. ECF No. 5-11 Cochenour Decl., Attach. K, BLM Notice of Prop. Decision (Jan. 16, 2026). In the proposal, BLM's position flipped to align with Montana and livestock groups, concluding that American Prairie's bison suddenly do not qualify for BLM grazing permits under the TGA. *Id*. BLM decided American Prairie's bison "are not managed for production-oriented purposes" and "do not fall within the meaning of the terms *livestock* and *domestic* as those terms are used in the applicable statutory authorities." *Id*. at 4.

The Proposed Decision was met with 35 protests, including American Prairie's, which challenged BLM's new "production" requirement as contrary to the TGA. 2026 Final Decision at 2. American Prairie also presented substantial evidence that its bison are "production-oriented" and that its bison are used for public meat consumption, sold commercially, and supplied to other livestock

operators for genetic seed stock and food sovereignty programs. ECF No. 5-3 Cochenour Decl., Attach. C at pdf p. 78–79. This evidence remains unrefuted.

BLM terminated American Praririe's grazing permits because the organization made public statements regarding its conservation goals. 2026 Final Decision at 5–7. Although recognizing that "some" of American Prairie's practices produced meat, BLM found its speech disqualifying because it is "not the language of a livestock production-oriented operation." *Id*. at 6.

American Prairie filed a timely administrative appeal and petitioned for stay on June 4, 2026. ECF No. 5-12 Cochenour Decl., Attach. L. Before DCHD decided the stay motion, on July 13, 2026, Secretary Burgum again assumed jurisdiction over the appeal, which was dismissed by DCHD the next day. Dkt. Nos. 5-13, 5-14 Cochenour Decl., Attachs. M, N. No decision has been issued on American Prairie's administrative stay motion within the 45-day time limit under 43 C.F.R. § 4.171(e). Thus, the Final Decision is operative and ripe for judicial review by this Court. 43 C.F.R. § 4.174(b); *id*. § 4.21(b) ("A decision that is in effect, or goes into effect, pending completion of an appeal is final agency action for the Department."); *see also id*. § 4.174 (A BLM grazing decision becomes "effective immediately after the ALJ denies or partially denies the petition for a stay or fails to act on the petition within the time specified in § 4.171(e).").

"Exhaustion does not require an appeal of a denial of a petition for a stay." 43 C.F.R. § 4.174(b).

## LEGAL BACKGROUND

### I.   TAYLOR GRAZING ACT

Congress adopted the Taylor Grazing Act of 1934 (TGA) against the backdrop of a severe drought that depleted public ranges of forage and left them unable to sustain the livestock being grazed. Department of the Interior, BLM, ECF No. 5-15 Cochenour Decl., Attach. O, 50 Years of Public Land Management 1, 3 (1984). The TGA regulates grazing lands in order "to preserve the land and its resources from destruction or unnecessary injury." 43 U.S.C. § 315a. To do so, the TGA authorizes BLM to issue grazing permits to "bona fide settlers, residents, and other stock owners" pursuant to BLM regulations. 43 U.S.C. § 315b. For almost fifty years, BLM's regulations have authorized the issuance of livestock grazing permits for indigenous animals such as bison. 43 Fed. Reg. 29067, 29070, 29073 (July 5, 1978). The TGA regulations also require applicants to (1) own or control land or water base property, and (2) either meet United States citizenship requirements, or be an entity authorized to conduct business in the state in which

8

grazing is intended. 43 C.F.R. § 4110.1(a) (2005).[1] The TGA and its implementing regulations do not reference the word "production," nor do they include a purpose-based requirement for approved grazing practices.

## II.   FLPMA AND PRIA

Congress later enacted the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq*., and the Public Rangelands Improvement Act (PRIA), 43 U.S.C. §§ 1901 *et seq*., which modernized and expanded the federal grazing framework.

In adopting FLPMA in 1976, Congress directed the Department of Interior to manage public lands based on concepts of "multiple use" (use for various purposes, such as recreation, range, timber, minerals, watershed, wildlife and fish, and natural and scenic, scientific, and historical values), 43 U.S.C. § 1702(c), and "sustained yield" (regular renewable resource output maintained in perpetuity), *Id*. § 1702(h).

Two years after FLPMA, Congress enacted PRIA to ensure that if grazing uses are continued on public lands, the goal of managing them "shall be to improve the range conditions … so that they become as productive as feasible in accordance

---

[1] Although BLM updated its grazing regulations in 2006, their implementation was enjoined. *W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008), *aff'd* 632 F.3d 472 (9th Cir. 2011). Thus, American Prairie cites to BLM's 2005 regulations.

with the rangeland management objectives established through [FLPMA's] land use planning process, and consistent with the values and objectives" Congress identified in PRIA. Those values and objectives include—besides livestock production—"wildlife habitat, recreation, forage, and water and soil conservation," and "the value of such lands for recreational and esthetic purposes." *Id*. § 1901(a)(1),(3).

## STANDARD OF REVIEW

A party is entitled to a preliminary injunction and a temporary restraining order if it demonstrates that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of equities tips in [its] favor"; and (4) "injunct[ive relief] is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The analysis is "substantially identical for the injunction and TRO" and the Court need not address them separately. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.¸* 240 F.3d 832, 839, n.7 (9th Cir. 2001).[2]

---

[2] In addition to Rule 65 injunctive relief, a party seeking APA judicial review may be entitled to a stay under 5 U.S.C. § 705. "[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025).

10

Courts in the Ninth Circuit apply the "serious questions" test—a sliding scale variant of the *Winter* test— which requires "a lesser showing than likelihood of success on the merits" when the balance of hardship tips "sharply" in plaintiff's favor. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). Serious questions are ones "that 'cannot be resolved one way or the other at the hearing on the injunction' because they require 'more deliberative investigation.'" *Id.* at 1192. A party need not demonstrate a certainty of success, nor even a probability of success, but must instead merely show "a fair chance of success on the merits" along with the other three factors. *Id.*

Under the APA, courts will find an agency decision unlawful if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts may not defer to an agency interpretation of the law, even if a statute is ambiguous. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). The reviewing court "independently interpret[s] the statute and effectuate[s] the will of Congress subject to constitutional limits." *Id.* at 371.

## ARGUMENT

American Prairie satisfies the preliminary-injunction standard. It is likely to succeed because BLM's 2026 Final Decision unlawfully adds a "production-oriented" eligibility requirement to the TGA and arbitrarily reverses decades of

11

practice while ignoring unrebutted evidence that American Prairie's bison are domestic livestock. Without relief, American Prairie must remove more than 900 bison by September 30, 2026, causing unrecoverable financial losses, genetic and physical harm to the herds, and damage to its mission. The balance of harms and public interest also favor preserving the status quo: American Prairie has grazed bison on these allotments for years without demonstrated harm, while removal would injure American Prairie, local communities, ranch lessees, tribes, and the public. The Court should enjoin implementation of the Final Decision while this case proceeds.

## III.   AMERICAN PRAIRIE IS LIKELY TO SUCCEED ON THE MERITS

### A.   BLM's 2026 Final Decision Violates the Taylor Grazing Act.

At the heart of BLM's decision to rescind American Prairie's permits is its erroneous interpretation of the TGA to limit grazing permits only to operations in which "the animals to be grazed are domestic and will be used for production-oriented purposes." 2026 Final Decision at 3. BLM's new "production-oriented" requirement contravenes the "best reading" of the TGA, *Loper Bright Enters.*, 603 U.S. at 400, and therefore is "not in accordance with law," 5 U.S.C. § 706(2)(A). *See Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) ("Whether agency action is 'not in accordance with law' is a question of statutory interpretation.").

Contrary to BLM's re-interpretation, the TGA does not limit the issuance of grazing permits to owners of production livestock. The statute authorizes BLM to issue grazing permits to "bona fide settlers, residents, and other stock owners" pursuant to BLM regulations. 43 U.S.C. § 315b. Evaluating this language, the U.S. Supreme Court has rejected essentially the same interpretation BLM advances here. *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 745–46 (2000). The Court noted that just two sentences after broadly authorizing permits for "other stock owners," the Act grants leasing preference to a narrower class of applicants: "landowners engaged in the livestock business." *Id*. at 746. The Court observed that limiting the term "other stock owners" to those engaged in the livestock business, as the livestock-industry plaintiffs urged, would impermissibly render the language granting preference to those engaged in the livestock business meaningless. *Id.* Giving effect to both provisions, the Court held that the TGA's plain language authorizes BLM to issue grazing permits to individuals who are *not* engaged in the livestock business. *Id*. at 746–47.

The "best reading" of the TGA that the Court applied in *Public Lands Council* forecloses BLM's claim that a "production" requirement is inherent in the statute's grazing provisions. Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and [their] reluctance is even greater when Congress has shown elsewhere in the same

13

statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005); *see also Bittner v. United States*, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, [courts] normally understand that difference in language to convey a difference in meaning."). Where Congress expressly narrowed the class of stock owners eligible for *preference* rights, 43 U.S.C. § 315b, BLM's interpretation similarly limiting eligibility for *all* grazing permits is impermissible.

The source of BLM's new "production" requirement is a convoluted parsing of dictionary definitions. To arrive at its decision, BLM split the closed compound "livestock" into two words—"live" and "stock"—and consulted Black's Law Dictionary to define the word "stock" as "a merchant's goods that are kept for sale or trade." 2026 Final Decision at 3 (citing Black's Law Dictionary (12th ed. 2024)). But BLM's acrobatics were unnecessary, because Black's Law Dictionary provides a definition of the whole word "livestock" as it appears in the TGA. "Livestock" means "[f]arm animals; specifically, domestic animals and fowls that (1) are kept for profit or pleasure, (2) can normally be confined within the boundaries without seriously impairing their utility, and (3) do not normally intrude on others' land in such a way as to harm the land or growing crops." Black's Law Dictionary (12th ed. 2024). While BLM declined to reference this

14

definition, "livestock" is *not* limited to animals raised exclusively for production, undermining BLM's interpretation.

BLM's references to "*domestic* livestock grazing" in FLPMA and PRIA also fail. 2026 Final Decision at 3–4 (citing 43 U.S.C. § 1752(a) (FLPMA) and *id.* § 1902(a) (PRIA)). BLM asserts that "domestic" means "the opposite of wild," relying on the Merriam-Webster dictionary's definition of "tame, domesticated." *Id.* at 4 n.2. BLM did not explain why it did not consult Black's Law Dictionary in this portion of its analysis, as it did when it addressed the meaning of "stock." Black's defines a "domestic animal" as one that is "customarily devoted to the service of humankind at the place where it normally lives, such as a dog or cat" or one that "is statutorily so designated," as American Prairie's bison are under Montana law. *See* 2026 Final Decision at 7 (citing Mont. Code Ann. § 81-1-101(4), (6)). Whether one relies on Merriam-Webster or Black's, the result is the same: animals that are owned and reduced to captivity, like American Prairie's bison, are "domestic." *See infra*, Sect. I.B.

BLM previously rejected the imposition of a production requirement for American Prairie's grazing permits that it now embraces. BLM explained that any "requirement of 'production' would read words and requirements into the TGA and its implementing regulations that are notably absent." ECF No. 5-7 Cochenour Decl., Attach G at pdf p. 146, BLM Summ. J. Brief Br. at 24 (citing 43 U.S.C. §

15

315b). Indeed, at no time in the two decades since BLM first issued grazing permits to American Prairie has it imposed a production requirement. While neither of BLM's statutory interpretations are entitled to deference, *Loper Bright Enters.*, 603 U.S. at 413, the government's repeated rejection of "the interpretation it now asks us to adopt … surely … counts as one more reason yet to question whether its current position represents the best view of the law." *Bittner*, 598 U.S. at 97.

Because BLM's newly adopted production requirement finds no basis in the TGA, it must be rejected.

### B.      BLM's Final Decision is Arbitrary and Capricious in Violation of the APA.

BLM's 2026 Final Decision irrationally rejected America Prairie's extensive proof that its bison are "domestic" "livestock," as BLM now defines those terms. Because BLM "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency," its decision was arbitrary and capricious, and should be set aside. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

American Prairie's bison are "used for production-oriented purposes," including "in support of production-oriented operations," as BLM's new standard requires. 2026 Final Decision at 4. Nearly half of American Prairie's bison have

16

been directly sourced for their meat or sent to other operators for meat production or other valid uses. ECF No. 5-3 Cochenour Decl., Attach. C at pdf p. 13–14. Since 2016, members of the public have harvested 370 bison, providing approximately 75,000 pounds of meat. *Id.* at pdf p. 14, 79. Further, 645 bison have been shipped to other herds in Montana, Colorado, Nebraska, Arizona, South Dakota, Washington, Washington D.C., Pennsylvania, and Oklahoma to supplement genetics, start food sovereignty programs, increase herd size, to return an animal of cultural significance to their land, and for hunting and harvesting opportunities. ECF No. 4 Heidebrink Decl., ¶¶ 57–59.

BLM arbitrarily dismissed this production evidence because it concluded that some of these practices are "not familiar to livestock cattle operation." 2026 Final Decision at 5 (discussing public bison harvest). BLM concedes that "some" of American Prairie's practices "resemble those that a *true* production-oriented operation might undertake" *Id.* (emphasis added). BLM does not define "true" production-oriented operation or explain the level of deviation the agency will tolerate from that archetype. BLM's standards are so vague that it is impossible for regulated parties to "know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). BLM provides no rational explanation why this evidence does not meet its new production requirement.

17

BLM gave the same arbitrary treatment to its consideration of whether American Prairie's bison are "domestic." American Prairie's bison are its private property, have a monetary value, and are subject to Montana's per capita livestock fees. ECF No. 5-3 Cochenour Decl., Attach. C at pdf p. 15, 16, 76. American Prairie submitted photos to the agency of its bison corralled in a squeeze chute, wearing a head halter, and being swabbed for disease testing. *Id*. at pdf p. 16, 136–142. Further, Montana classifies American Prairie's bison as domestic livestock as a matter of law under § 81-1-101(4),(6) MCA (defining "domestic" bison as those reduced to captivity, subject to livestock fees, and owned by a person). 2026 Final Decision at 7. Nevertheless, BLM insisted that American Prairie's bison are wild. *Id*.

Overriding American Prairie's evidence, BLM relied on the organization's public statements on a podcast, YouTube video, and its website to conclude that American Prairie's speech "is not the language of a livestock-oriented operation." 2026 Final Decision 6. But such statements describing the organization's *purpose* do not negate American Prairie's use and management of its privately owned bison. The practices described above show that American Prairie's bison met BLM's standard for production and domesticity. In nonetheless concluding that American Prairie is ineligible for bison-grazing permits, BLM arbitrarily "relied on factors which Congress has not intended it to consider" and "offered an

18

explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

BLM's 2026 Final Decision also is arbitrary because BLM offers no "reasoned explanation" of its sudden change in policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The APA requires an agency changing positions to: (1) acknowledge its policy change, (2) show that the new policy is legally permissible, (3) provide a reasoned explanation for the new policy, and (4) consider "serious reliance interests" engendered under the prior policy. *Id.* at 515–16. BLM satisfied none of these factors.

Prior to BLM's 2026 Final Decision, it did not require a "production-oriented" purpose. BLM first issued grazing permits for American Prairie's bison in 2005 without imposing a production requirement, and confirmed this policy in 2008 and 2022, for years rejecting the very arguments it now advances. By failing to acknowledge its reversal, BLM impermissibly "depart[ed] from a prior policy *sub silentio." Id*. at 515.

Nor is BLM's reversal permissible under statute, *id*., which forecloses BLM's novel statutory interpretation that creates extra-statutory requirements. *See supra* Section I.A.

BLM provides no reasoned explanation for its reversal. *Fox Television*, 556 U.S. at 516. BLM does not explain why it re-interpreted a statute that has not

substantially changed since it was adopted in 1934. Nor does the BLM identify any factual change since BLM determined that, under American Prairie's 2022 permits, it would "manage the bison as a domesticated livestock herd." ECF No. 5-16 Cochenour Decl., Attach. P at A-15, A-18 (BLM Public Comment Report). This was arbitrary, because "even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015).

BLM did not consider the "serious reliance interests" created by its longstanding policy that is now overturned. *Fox Television*, 556 U.S. at 515–516. American Prairie relied on BLM's steady approvals for two decades, increasing its herd size, contracting to supply bison to other entities, and making costly infrastructure investments on the federal allotments. ECF No. 5-3 Cochenour Decl., Attach. C at pdf p. 2, 28, 48. American Prairie's investments in reliance on BLM's policy—which exceeded $350,000 in fencing upgrades—will be lost due to BLM's sudden reversal. *Id.* at pdf p. 2.

BLM offered no reasoned explanation for its policy departure, leading to the conclusion that its decision is nothing short of an arbitrary and capricious action.

## IV.   AMERICAN PRAIRIE WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED

Absent a preliminary injunction, BLM's 2026 Final Decision will immediately and irreparably harm American Prairie's financial health, the health of

its bison herds, and its core mission. Irreparable harm is "harm for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Economic harm is irreparable when parties cannot recover monetary damages, as is often the case in APA suits against the government. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (citations omitted). Similarly, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often…irreparable." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007). A plaintiff is irreparably harmed by showing serious "ongoing harms to their organizational missions." *Washington v. U.S. Dep't of Educ.,* 807 F. Supp. 3d 1275, 1290 (W.D. Wash. 2025), *appeal dismissed,* No. 25-7157, 2026 WL 395718 (9th Cir. Jan. 14, 2026).

The 2026 Final Decision has already resulted—and will continue to result—in irreparable economic harm to American Prairie. Additionally, by forcing American Prairie to cull or transfer approximately 300 bison by September 30, 2026, the decision will cause genetic and physical injury to American Prairie's bison herd. Because restoring and responsibly managing bison on large native-grassland landscapes is a central part of American Prairie's work to conserve the shortgrass prairie ecosystem for the benefit of wildlife and people, BLM's decision also will cause irreparable harm to American Prairie's core mission. ECF No. 4

21

Heidebrink Decl., ¶¶ 62, 66–67. Injunctive relieve is necessary to stop these irreversible harms to American Prairie.

### A.    BLM's Decision Causes Irreparable Financial Harm to American Prairie.

Without injunctive relief, BLM's Decision will cause American Prairie severe financial harm in the form of leasing, infrastructure, and labor costs, lost value of reduced herds, and lost income from reduced operations. BLM's mandate to remove the bison by September 30, 2026, is costly because they cannot simply be relocated to American Prairie's deed lands. Most of American Prairie's deeded acreage is unavailable or unsuitable for bison due to cattle leases, inadequate fencing, intermingled lands not approved for bison, and insufficient forage. American Prairie's suitable deeded lands can support only about 600 to 650 animals. *Id.* ¶ 17. Accordingly, BLM's decision will require American Prairie to cull roughly 300 animals before the September 30 deadline or invest in replacement leases if they exist. *Id.* ¶¶ 16–28. Both scenarios impose substantial costs.[3]

The displacement of American Prairie's bison will impose unrecoverable lease, infrastructure, labor, and herd-value losses. Replacement leases, if available,

---

[3] American Prairie has already incurred substantial costs to meet the removal deadline for "hay, fencing materials, construction contractors, trucking, corrals, veterinary services, replacement grazing, water infrastructure, staffing, and equipment." *Id.* ¶¶ 13–14.

22

would cost about $105,000 annually, plus more than $200,000 for fencing and water infrastructure and another $100,000 for capture, handling, sorting, and shipping. *Id*. ¶¶ 26–28. However, suitable replacement leases are scarce because most lack bison-specific infrastructure. *Id*. If no lease is available, losing 300 bison would cost $739,800 in animal value and $184,950 annually in lost calves. *Id*. ¶¶ 32–33. To mitigate resulting genetic harm, American Prairie would also need to purchase ten bulls over two years at about $100,000, after months of vetting and quarantine. *Id*. ¶¶ 34–35.

American Prairie has already spent $36,960 on hay and must spend another $96,000 due to the BLM's September 30, 2026, deadline; it also stands to abandon more than $350,000 in bison-specific improvements made in reliance on BLM approvals and spend at least $7,000 more on deeded-land fencing. *Id*. ¶¶ 11, 41–44. Because of the dispersal of bison and reduced herd size, American Prairie had to cancel its annual public harvest, which is expected to result in a $25,000 loss this year alone. *Id*. ¶ 54. These costs will only increase as the September 30 removal deadline approaches. *Id*. ¶ 66.

Absent injunctive relief, the unplanned $300,000 operational disruption would materially harm American Prairie's financial security and increase 2026 bison-program expenses by about 30 percent. *Id*. ¶ 49. Because no viable cause of

23

action exists against BLM for recovery of money damages, the costs constitute substantial irreparable harm. *See E. Bay Sanctuary*, 993 F.3d at 677.

> **B.**     **BLM's Decision Will Cause Genetic Harm to American Prairie's Bison.**

Forcing American Prairie to reduce its bison herds by 300 animals and disperse the herds into smaller groups will irreparably harm their genetic health and growth potential. Putnam Decl., ¶¶ 17–19. The bison are part of a selective breeding herd developed over two decades and offer substantial value to American Prairie through their known genetics, age, reproductive status, health history, contribution to herd social structure, and more. ECF No. 4 Heidebrink Decl., ¶ 30. "American Prairie's bison herds are among the most genetically diverse conservation herds in North America." Putnam Decl., ¶¶ 10, 17, 19. This genetic value is crucial in preventing extinction of American Prairie's herds and cannot be replaced with financial compensation or replacement animals. *See id.* ¶ 8.

In addition to the loss of 300 bison, transferring the remaining 650 bison to deeded lands would harm their genetic health by fragmenting the herds. American Prairie requires herds of at least 400 bison and 10,000 contiguous acres to preserve genetic viability, but most deeded lands cannot provide that acreage because of small parcels and checkerboard ownership. ECF No. 4 Heidebrink Decl., ¶¶ 19–22. "Herd size is the single most important determinant of the rate at which a closed bison herd loses genetic diversity." Putnam Decl., ¶ 19. Smaller closed herds lose

24

diversity faster, risk negative growth and inbreeding, and may become perpetually dependent on outside animals; even imported bulls would not quickly rebuild lost genetic lines, age structure, or reproductive capacity. *Id.* ¶¶ 17–19; ECF No. 4, Heidebrink Decl., ¶ 36. These impacts constitute irreparable environmental harm. *Sierra Club*, 510 F.3d at 1033.

### C.    BLM's Decision Will Physically Harm Bison.

Relocation would also physically harm the bison, beyond the genetic health threats detailed above. Moving bison requires gathering, confinement, sorting, veterinary review, loading, transportation, and unloading of animals, all of which can cause substantial stress to the bison. ECF No. 4 Heidebrink Decl., ¶¶ 38–40; *id.* Attach. D, Zaluski Decl., ¶¶ 11–12. Transportation increases the risk of injury, mortality, disease transmission, immune suppression, fence pressure, escape, and operational disruption. *Id.* ¶¶ 11–13; ECF No. 4 Heidebrink Decl., ¶ 39. BLM's arbitrary September 30 deadline does not align with seasonal conditions, animal behavior, infrastructure readiness, or safe operations, resulting in unnecessary, immediate, and irreparable harm. *Id.* ¶ 40; *id.* Attach. D, Zaluski Decl., ¶ 14. In sum, BLM's 2026 Final Decision will irreparably harm American Prairie through severe financial costs, injury to its bison herds, and harm to the organization's mission. An injunction is needed to prevent this harm to preserve the status quo—

25

allowing American Prairie to graze bison on federal allotments, as they have for the last twenty years—until a decision on the merits is made.

## V.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING RELIEF

American Prairie's injuries alone warrant relief, and the public interest and lack of countervailing harm confirm it. The balance-of-harms and public-interest factors merge when the government is a party. *Winter*, 555 U.S. at 24; *see Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). Preserving the status quo protects all parties because American Prairie has grazed bison on BLM lands for more than twenty years without any demonstrated harm.

BLM has already admitted multiple times in the administrative appeals that American Prairie's bison cause no harm to the BLM allotments. Recognizing that American Prairie's "bison are grazing today" on federal lands, BLM emphasized that the record contains "no support that the grazing that APR's cattle or bison are engaged in, are harming the public lands." ECF No. 5-7 Cochenour Decl., Attach. G, pdf. p. 20, BLM Resp. to Stay. The DCHD agreed and found that Montana and livestock groups "fail[ed] to produce evidence that identifies any immediate or irreparable harm that is likely to occur" from American Prairie's bison grazing. ECF No. 5-5 Cochenour Decl., Attach. E at 22, DCHD Order. The DCHD also concluded, from BLM's own economic analysis, that "non-production" bison grazing would be "modestly more beneficial to the local economy over the course

of one year," estimating "a gain of 4 jobs," increased direct labor income, and increased direct economic output. *Id.* at 21–22. The IBLA affirmed, finding no showing of "any specific economic harm to themselves or their members." ECF No. 5-6 Cochenour Decl., Attach. F at 13, IBLA Order. BLM did not revoke its prior analyses on remand and therefore the Court should look to the agency's undisturbed prior conclusion that American Prairie's continued bison grazing will not significantly harm the allotments.

Nor would other livestock operators, wildlife, or the public be harmed. BLM explained that American Prairie has committed to practices through permit terms, agreements with Phillips County, and Montana law that address any risk of disease transmission. ECF No. 5-7 Cochenour Decl., Attach. G at 9–10, BLM Response to Stay. The IBLA affirmed that Montana offered "no evidence that any disease transmission was likely to occur or result in immediate and irreparable harm to the State." ECF No. 5-6 Cochenour Decl., Attach. F, at 15, IBLA Order. And removing bison would harm livestock producers because it requires the organization to break leases with and displace the ranchers who currently occupy American Prairie's deeded lands. Currently, more than 80% of American Prairie's total deeded acres are leased to other ranchers who graze approximately 8,000 cattle. ECF No. 4 Heidebrink Decl., ¶ 21; *Id*. Attach. B, Lease Information. The

displaced ranchers will endure many of the same harms described above, inflicting injury on the very ranchers that BLM claims to protect.

Public-land resources also would not be harmed and would be improved by American Prairie's continued bison grazing. BLM's rangeland management specialist compared photos of the Telegraph Creek grazing allotment in 2022 to photos taken decades earlier. This evidence "quite clearly shows that ground cover has improved over time. Shrub size and density have increased…and the health and vigor of herbaceous grasses and forbs has increased dramatically." *Id*., Attach. E, BLM Field Report. Montana Department of Natural Resources and Conservation affirmed these findings in its field evaluations, noting that bison had been grazing on the Boxelder Creek area since 2009 and that the lease area was in good condition and expected to remain so without concern. *Id*., Attach. F, DNRC Field Report.

Finally, denying an injunction would harm tribal partners because it would limit American Prairie's ability to supply bison to tribes to support food sovereignty, culturally significant herd restoration, and hunting opportunities, which historically has resulted in 645 bison transfers to other entities and tribes— including the Blackfeet Nation, Fort Belknap Indian Community, Fort Peck Assiniboine and Sioux Tribes, Chippewa Cree Tribe of Rocky Boy, Little Shell

28

Tribe of Chippewa, Quapaw Nation, Cheyenne River Sioux Tribe, Rosebud Sioux Tribe, and Kalispel Tribe of Indians. *Id*. ¶¶ 58–61.

In short, no party or potential party would be harmed by preserving the status quo. The balance of the harms and the public interest favor granting a preliminary injunction and allowing American Prairie's bison to remain. *See Winter*, 555 U.S. at 24.

## CONCLUSION

A preliminary injunction enjoining BLM from implementing its 2026 Final Decision is necessary to prevent irreparable harm to American Prairie while this case proceeds on the merits. Because the decision requires removal of bison by September 30, 2026, a temporary restraining order is also necessary to preserve the status quo until the Court rules on the preliminary injunction. Maintaining status quo triggers no harms as demonstrated by American Prairie's more than twenty years of lawful grazing.

Respectfully submitted this 4th day of August, 2026,

/s/*Mary E. Cochenour*

Mary Cochenour
Cochenour Law Office, PLLC
7 West 6th Avenue, Suite 4I
P.O. Box 1914
Helena, MT 59624
(406) 422-8716
mary@cochenourlawoffice.com

Jenny Harbine
Emma Shahabi
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699 | Phone
(406) 586-9695 | Fax
jharbine@earthjustice.org
eshahabi@earthjustice.org

*Counsel for Plaintiff American Prairie*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6,463 words, excluding the caption, table of contents and authorities, signature blocks, and certificates of compliance and service.

/s/ Mary E. Cochenour
Mary E. Cochenour
Counsel for American Prairie

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2026, I caused an accurate copy of the foregoing document to be served via First Class mail on Defendants.

Todd Blanche
Acting Attorney General
US Department of Justice
950 Pennsylvania Ave NW
Washington DC 20530

US Bureau of Land Management
1849 C St NW
Washington DC 20240

Doug Bergum
Secretary of the Interior
1849 C St NW
Washington DC 20240

Stevan Pearce
BLM Director
1849 C St NW
Washington DC 20240

Mark Steger Smith
Acting US Attorney
2601 2nd Ave N, STE 3200
Billings MT 59101

*/s/ Mary E. Cochenour*
Mary E. Cochenour
Counsel for American Prairie

2