Anita Y. Milanovich (MSB #12176)
Rachel K. Meredith (MSB #11552)
Office of the Governor
1301 E. 6th Avenue
PO Box 200801
Helena, MT 59620-0801
Phone: 406-444-5503
Email: anita.milanovich@mt.gov
rachel.meredith@mt.gov
*Counsel for Proposed Intervenor-Defendant*

Brian C. Bramblett (MSB #6560)
Chief Legal Counsel
Montana Department of Natural Resources and Conservation
PO Box 201601
Helena, MT 59620-1601
Telephone: (406) 444-9758
Email: bbramblett@mt.gov
*Counsel for Proposed Intervenor-Defendant*

Lindsey Simon (MSB #34338757)
Legal Counsel
Montana Department of Livestock
PO Box 202001
Helena, MT 59620-2001
Phone: (406) 444-7631
Email: lindsey.simon3@mt.gov
*Counsel for Proposed Intervenor-Defendant*

Alexander R. Scolavino III (MSB #68806621)
Montana Department of Fish, Wildlife and Parks
PO Box 200701
Helena, MT 59620-0701
Phone: (406) 444-4047
Email: Alexander.scolavino@mt.gov
*Counsel for Proposed Intervenor-Defendant*

Anna M. Kecskés (MSB #36411019)
Legal Counsel
Montana Department of Agriculture
302 North Roberts
Helena, MT 59620
Phone: (406) 444-5402
Email: anna.kecskes@mt.gov
*Counsel for Proposed Intervenor-Defendant*

RECEIVED
AUG 17 2026
Clerk, U S District Court
District Of Montana
Butte, Montana

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| AMERICAN PRAIRIE FOUNDATION,<br>Plaintiff, | Docket No. CV-26-282-GF-BMM |

| | |
|---|---|
| v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and STEVAN PEARCE, in his official capacity as Director of the United States Bureau of Land Management,<br><br>Defendants. | **(PROPOSED) RESPONSE OPPOSING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION OR STAY** |

**TABLE OF CONTENTS**


LEGAL BACKGROUND ........ 1

I. The 1934 Taylor Grazing Act (TGA) ........ 1

II. The 1976 Federal Land Policy and Management Act (FLPMA) ........ 2

III. The 1978 Public Rangelands Improvement Act (PRIA) ........ 3

IV. BLM Regulation ........ 3

FACTUAL BACKGROUND ........ 4

ARGUMENT ........ 10

I. APF is Not Likely to Succeed on the Merits. ........ 12

A. The 2026 BLM Decision is legally correct. ........ 12

1. The 2026 BLM Decision implements the TGA, FLPMA, PRIA, and BLM's own regulations. ........ 12

2. The 2026 BLM Decision aligns with legal and agency precedent. ........ 14

B. The 2026 BLM Decision rationally terminated APF's grazing permits. ........ 16

1.Evidence demonstrates APF's bison are wild, undomesticated, and not for production. ........ 16

2.The 2026 BLM Decision applies the law consistent with facts and past practice. ........ 18

II. APF Will Not Suffer Irreparable Harm if Injunction is Denied. ........ 19

A. Claimed financial harms are speculative and/or not irreparable. ........ 19

B. APF's "genetic harm" is mitigable and not irreparable. ........ 21

C. Claims of "physical harm" are speculative. ........ 24

III. The Balance of Harms and Public Interest Both Weigh Against Injunction. ........ 24

CONCLUSION ........ 28

## TABLE OF AUTHORITIES

### *Federal Cases*

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ........ 19, 20

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........ 11

*Bar K v. U.S.*, 2021 U.S. Dist. LEXIS 138141 (D. Mont. 2021) ........ 27

*Chournos v. U.S.*, 193 F.2d 321 (10th Cir. 1951) ........ 1

*Corrigan v. Haaland*, 12 F.4th 901 (9th Cir. 2021) ........ 2

*Faulkner v. Watt*, 661 F.2d 809 (9th Cir. 1981) ........ 1-2

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........ 18

*Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*, 98 F.4th 1180 (9th Cir. 2024) ........ 11

*Immigrant Defs. L. Ctr. v. Noem,* 145 F.4th 972 (9th Cir. 2025) ........ 11, 24

*Pub. Lands Council (PLC) v. Babbitt*, 529 U.S. 728 (2000) ........ 1, 14, 15

*PLC v. Babbitt*, 167 F.3d 1287 (10th Cir. 1999) ....................12

*Roe v. Critchfield,* 137 F.4th 912 (9th Cir. 2025) ....................11

*U.S. v. Bundy*, 1998 U.S. Dist. LEXIS 23835 (D.C. Nev. 1998) ....................26, 27

*U.S. v. Fuller*, 442 F.2d 504 (9th Cir. 1971) ....................1

*Valdez v. Applegate*, 616 F.2d 570 (10th Cir. 1980) ....................27

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ....................28

*Winter v. NRDC*, 555 U.S. 7 (2008) ....................10, 12, 19

***State Cases***

*In re Powder River Drainage Area*, 216 Mont. 361, 702 P.2d 948 (1985) ......26, 27

*Jerke v. St. Dep't of Lands*, 182 Mont. 294, 597 P.2d 49 (1979) ....................27

*Montanans for the Responsible Use of the Sch. Tr. v. St.*, 1999 MT 263, 296 Mont. 402, 989 P.2d 800 ....................26

*St. ex rel. Thompson v. Babcock*, 147 Mont. 46, 409 P.2d 808 (1966) ....................26

***Federal Statutes and Legislative Materials***

5 U.S.C. § 705 ....................10

43 U.S.C. § 315 ....................3

§ 315a-315r ....................3

§ 315b ....................2, 14, 15

§ 1701 ....................4

§ 1701(a)(7) ....................2

§ 1701(12) ....................2

§ 1702(c) ....................2

§ 1702(h) ....................2

§ 1702(p) ....................2, 13

§ 1752 ....................13

§ 1752(a) ....................2

§ 1901(a)(5) ....................3

§ 1901(b)(2) ....................4

§ 1902(a) ....................3, 13

§ 1902(c) ....................3, 13

Enabling Act of February 22, 1889, ch. 180, 25 Stat. 676 (1889)....................26

The Taylor Grazing Act, 48 Stat. 1269 (1934) ....................*passim*

The Federal Land Policy and Management Act, 90 Stat. 2743 (1976) ....................*passim*

The Public Rangelands Improvement Act, 92 Stat. 1803 (1978) ....................*passim*

### *State Constitution*

Mont. Const. art. X, §11 ....................26, 27

### *State Statutes and Legislative Materials*

§ 77-6-507(1), MCA ....................27

§ 81-1-101(4), MCA ....................18

§ 81-1-101(6), MCA ....................18

### *Federal Regulations and Administrative Materials*

43 C.F.R. § 4100.0-2....................4

§ 4100.0-2(a) ....................13

§ 4100.0-5 .......... 13

§ 4130.2 .......... 13

§ 4130.3 .......... 13

§ 4130.3-1 .......... 13

### *State Regulation*

Admin. R. Mont. 36.25.102(1) and (2) .......... 27

### *Administrative Proceedings*

*Hampton Sheep Co. v. BLM*, Wyo. 1-74-1 (1975) .......... 15, 16, 18

### *Federal Rules of Civil Procedure*

Fed. R. Civ. P. 65 .......... 10

### *Other Authorities*

*Black's Law Dictionary* (12ed. 2024) .......... 14

The U.S. Bureau of Land Management's (BLM) May 8, 2026 *Notice of Final Decision* (2026 BLM Decision) terminating American Prairie Foundation's (APF) grazing permits was required by law, agency precedent, and because of the facts surrounding APF's bison herd. As such, APF is unlikely to prevail on the merits of its claims. APF has not articulated irreparable harm, nor a public interest sufficient to support an injunction. Whatever harm APF suffers, it does not exceed the harm injunction guarantees to the State of Montana (Montana).

APF's motion for a temporary restraining order and preliminary injunction or stay must be denied.

## **LEGAL BACKGROUND**

### I. **The 1934 Taylor Grazing Act (TGA)**

The express and conjunctive purposes of the TGA are to "stop injury" to the lands from "overgrazing and soil deterioration," to "provide for their use, improvement and development," and "***to stabilize the livestock industry dependent on the public range.***" *Pub. Lands Council (PLC) v. Babbitt*, 529 U.S. 728, 733 (2000) (quoting TGA, Pub. L. No. 73-482, 48 Stat. 1269, 1269 (1934)) (emphasis added). The TGA's mandate to stabilize the livestock industry has been recognized, time and again. *Chournos v. U.S.*, 193 F.2d 321, 323 (10th Cir. 1951) (cert denied, 343 U.S. 977 (1952)); *U.S. v. Fuller*, 442 F.2d 504, 507 (9th Cir. 1971) (reversed on other grounds, 409 U.S. 488 (1973)); *Faulkner v. Watt*, 661

F.2d 809, 812 (9th Cir. 1981). To this end, the TGA authorizes the Secretary of the Interior (SOI)

> to issue or cause to be issued ***permits to graze livestock*** on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range…

43 U.S.C. § 315b (emphasis added). The law grants permit preference to "those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights…." *Id.*

## II. The 1976 Federal Land Policy and Management Act (FLPMA)

FLPMA was enacted by Congress to implement a number of policy directives, including that public land management be on the "basis of multiple use and sustained yield unless otherwise specified by law," and that "public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands…". 43 U.S.C. § 1701(a)(7), (12); *see also*, § 1702(c), (h).

FLPMA supported the original foundations of the TGA, specifically embracing grazing permits and leases for "domestic livestock grazing" on public lands. 43 U.S.C. § 1752(a); *Corrigan v. Haaland*, 12 F.4th 901, 908 (9th Cir. 2021) (FLPMA did not eclipse the TGA). FLPMA defines "grazing permit and lease" to mean "any document authorizing use of public lands"…"for the purpose of ***grazing domestic livestock***." 43 U.S.C. § 1702(p) (emphasis added).

## III. The 1978 Public Rangelands Improvement Act (PRIA)

Congress perpetuated the same existing grazing authorizations for domestic livestock in PRIA. It also articulated policy declarations, including the prevention of "economic disruption and harm to the western livestock industry…." 43 U.S.C. § 1901(a)(5). PRIA adopted FLPMA's definition of a "grazing permit and lease," 43 U.S.C. § 1902(c), specifying its purpose for "grazing domestic livestock." PRIA also defined "rangelands" or "public rangelands" to mean BLM or U.S. Forest Service lands "***on which there is domestic livestock grazing*** or which the Secretary concerned determines may be ***suitable for domestic livestock grazing***." 43 U.S.C. § 1902(a) (emphasis added).

## IV. BLM Regulation

BLM's regulations recognize the economic objectives behind grazing permits, as set forth by the TGA, FLPMA, and PRIA.

> (a) The objectives of these regulations are to promote healthy sustainable rangeland ecosystems; to accelerate restoration and improvement of public rangelands to properly functioning conditions; to promote the orderly use, improvement and development of the public lands; to establish efficient and effective administration of grazing of public rangelands; ***and to provide for the sustainability of the western livestock industry and communities that are dependent upon productive, healthy public rangelands***.
>
> (b) These objectives will be realized in a manner consistent with land use plans, multiple use, sustained yield, environmental values, ***economic*** and other objectives stated in the [TGA] of June 28, 1934, as amended (43 U.S.C. 315, 315a-315r); section 102 of the [FLPMA]

> of 1976 (43 U.S.C. 1701) and the [PRIA] of 1978 (43 U.S.C. 1901(b)(2)).

43 C.F.R. § 4100.0-2 (emphasis added).

## FACTUAL BACKGROUND

Many of the facts of this case can be found in the "Factual and Procedural Background" included in Montana's *Unopposed Motion for Leave to Intervene* and brief in support, filed concurrently. They are incorporated, summarized, and supplemented here.

APF's bison herd is not a commercial, production herd. This is clear from APF's mission, which is to "create the largest nature reserve in the continental United States, a refuge for people and wildlife preserved forever as part of America's heritage." Decl. Rachel Meredith, Aug. 17, 2026, Attach. E, at Ex. 1 (2017 APF Ltr. to Gov. Bullock and Dir. Williams); *see also,* Attach. E, at Ex. 2 (APF Form 990 (2024)); *see also*, Attach. E, at Ex. 3 pp. 2[1], 107[2] (excerpts from *Wild on Purpose: The American Prairie Story*). Its goal is to "purchase 500,000

---

[1] "We planned to reintroduce [bison] as part of [APF's] mission, which is to carry out the largest privately funded restoration of a fully intact [sic] and wild prairie ecosystem in North America. One acre at a time, we are rebuilding essentially an American Serengeti, complete with . . . bison . . . and countless other species that have. . . been. . . wholly eradicated or reduced to miniscule populations and replaced with agricultural operations."

[2] "The main detail that Curt and I included in the vision from the beginning was a ***wildlife spectacle. . . we wanted visitors to have unforgettable wildlife encounters*** in places [sic] that felt impossibly big, quiet, and aesthetically beautiful." (Emphasis added).

acres and stitch together three million acres of existing public lands," creating a reserve larger than Yellowstone National Park. *Id.* at Attach. E, at Ex. 4 (2017 email from APF to BLM). APF's project is to create the "great grassland park that this country never built"[3] and an expansion of the C.M. Russell National Wildlife Refuge (CMR).[4]

The result is bison that are wild or "rewilded," rather than bison for commercial production. As described by APF founder Sean Gerrity in his 2025 book, *Wild on Purpose*:

> We have never wavered in our end goals. We wanted to ***create a***

[3] The Wild Idea podcast, American Prairie, Part Two—A Wilder Future, 4:26 (Nov. 18, 2025), https://thewildidea.com/episode-37/ (accessed Aug. 10, 2026):

> Danny and I work for an organization that started nearly 25 years ago as a wild idea that is now a wild reality, and that was to protect a big swath of our grasslands and to build the great grassland park that this country never built . . . we now are a, as I mentioned, nearly quarter century old nonprofit organization. ***And what we're doing is assembling a protected area, assembling a park*** . . . where some day all the native wildlife that once was there will be back in abundance.

[4] *Id.* at 17:13.

> American Prairie is kind of, in a way, seeking to, at least, where I'm sitting, make the [CMR] bigger than it is. . . . the [CMR] alone is the largest protected area in the temperate grasslands of North America in the Great Plains, you add 600,000 plus acres of American Prairie deeded and leased lands, and now it's even bigger. . . ***[a]nd so working with the CMR is largely about just like, how do we build a buffer around the CMR, a place where like wildlife can be tolerated, accepted, ecological processes can be stored, restored beyond the boundaries of the refuge itself.***

> ***wildlife reserve*** consisting of a minimum of 3 million-plus acres where—unlike anywhere else in the remaining 180 million acres of the Northern Great Plains—***nature and wildlife come first***. We wanted it to contain all the flora and fauna that existed there for the past three to four thousand years. ***We wanted a reserve that would stand the test of time in its legal status and its protections against those who might seek to compromise its quality for commercial gain***.

*Id.* at Attach. E, at Ex. 3 p.123 (emphasis added); pp.129-130[5], p.147[6], pp.213-214[7], p.273[8]; *see also,* video by APF's Wildlife Restoration Manager Daniel Kinka.[9]

---

[5] "I wanted [bison reintroduction] to happen as early as possible as it would give our current and future donors something exciting to look forward to . . . I also predicted that local Indigenous communities would appreciate that, as a new neighbor, we were bringing back a wild species whose loss they had been lamenting for generations."

[6] "For instance, as we continued to add acres to what would one day be our core wildlife reserve, a common conundrum . . . was nagging at me. The issue: Whenever you try to create a really large protected area, you will most likely be surrounded by an established industry where people are making money from the land or the water, creating potentially serious conflicts. . . . Land-based reserves are often surrounded by logging, farming, or cattle and sheep ranching."

[7] "I have frequently sat alone on the prairie contemplating our organization's end vision; a five thousand-square-mile reserve where wild nature is the top priority. I see it being surrounded by tens of millions of acres of the Northern Great Plains largely devoted to for-profit industry, but where people are much more amenable to having fabulously abundant wildlife as compared to past decades."

[8] "[T]wenty-five years ago, we, as a small group of people, believed we could create a great deal more space for nature in an area that has been almost exclusively devoted to large-scale for-profit agriculture for more than a century."

[9] https://www.facebook.com/share/v/1CrjLo32aw/ (accessed Aug. 10, 2026)

> Here at American Prairie in Central Montana, and one of the last remaining intact grasslands in the world, we are finding that ***restoring, rewilding important species, ecosystem engineers like bison . . .*** is not only helping to restore habitat, is not only increasing biodiversity, but

Indeed, in its founding reintroduction document, APF lists the "burgeoning commercial bison industry" as a factor *limiting* bison restoration. Decl. Meredith, Attach. E, at Ex. 5 at pp.7-8 (APF bison reintroduction plan excerpts). APF's reintroduction objectives include: establishing a "self-sustaining, naturally regulated, and ecologically effective population" subject to the forces of natural selection; establishing a source population for "wild bison" restoration; establishing a population contributing to the removal of wild bison from Montana's "list of species of concern"; and collecting and providing information to facilitate successful "wild bison restoration." *Id.*at p.10. It distinguishes its "wildlife reintroduction" from domestic bison, articulating the goal of a "naturally regulated free-ranging population of wildlife." *Id.* at pp.10-11.

> With respect to our premise, our primary goal will be to restore a population of bison that is ecologically effective over a large landscape. ***Such a goal is very much different than managing bison for production, or in small confined areas, or in the traditional livestock management paradigm***."

*Id.* (emphasis added).

---

> may actually be reanimating the carbon cycle . . . So on this World Rewilding Day, I'm actually hopeful, because rewilding is hope. We can rewild hope so that future generations don't have to find themselves in a world of wounds.

Through its actions, APF pursues an "exceptional contribution to bison conservation" by incorporating specific criteria (from Sanderson *et al.* 2008) into its program. *Id.*, Attach. E, at Ex. 6 at pp.37-38 (APF's *Bison Management Plan* excerpts). As identified by Sanderson, that contribution requires a "population structure ***managed by natural conditions without need for human intervention***," animals "***free to move on their own, with no exceptions***," and reliance on "all natural selection processes" without "active human intervention." *Id.*, Attach. E, at Ex. 7 at pp.259-262 (Sanderson *et al.* publication) (emphasis added). Per APF's consultant, Keith Aune, APF's commitment to minimal human intervention ensures "***there is no risk of domestication***..." of APF's bison. *Id.*, Attach. E, at Ex. 8, 101:12-102:4 (Aune deposition excerpt) (emphasis added); *id.*, Attach. E, at Ex. 9 at p.4 (2013 APF bison report).[10]

Access to government land is a windfall to APF's mission and goals. In a 2015 speech to Google, Gerrity explained.

> Here's how the government is contributing marvelously. Frankly, I have no complaints. Fundraising is hard, for sure. We're using it to buy the private land. But the government is allowing us, very progressively, I think, to use 2.5 million acres of BLM for this purpose. And we don't

[10] "Blood samples for annual herd health monitoring are acquired through darting a sample of animals with tranquilizers in the field rather than bringing in the entire herd and running them through chutes. Aside from brucellosis vaccination of imported females, APF does not vaccinate or medicate any of its bison. The Reserve does not provide supplemental feed in the winter except in very rare cases where snow has temporarily buried border fences and there is a risk of animals leaving the Reserve and entering neighboring property."

> have to buy it. That saves about $4 or $5 billion. That's key. ***They're allowing us to use government public land, without any kind of product like oil and gas, timber, mining, or cattle ranching.*** They're not asking us to use it for commercial purposes. That's fantastic. And we're one of the only ones they're allowing to do that. It's just never been asked before. "Hey, can we use millions and millions of acres for absolutely nothing, except the public's enjoyment?" So that's cool, I mean, we don't have to buy it.[11]

And it enjoyed considerable success by its own metrics. By 2017, APF's bison population was 860 animals. *Id.*, Attach. E, at Ex. 10 at p.1 (2016-2017 APF bison report). In its 2016-2017 Bison Report, APF explains that it would need to slow the rate of population increase from 20% to 10% by using "contraceptives, harvesting, and/or translocation to other herds." *Id.* at p.2.

APF bison hunts began in 2016. Doc. 5-3 at pdf p.78 (¶15). Harvests are conducted to mimic natural predation, and intended to occur "[u]ntil such time" as natural predators return to the area.[12] Of the 370 bison "harvested" since 2016, only 127 appear to have been in exchange for financial renumeration. Doc. 5-3 at pdf pp.78 (¶15) and 159-174. APF states that "successfully drawn entrants pay $300" for their hunting opportunity. *Id.* at pdf. p.78 (¶15). Hunt recipients are

---

[11] Talks at Google: Sean Gerrity (Apr. 14, 2015), https://www.youtube.com/watch?v=QUW-XemFSFo, 39:11 (accessed on Aug. 10, 2026) (emphasis added).
[12] APF, *Bison Harvest* (Oct. 28, 2020), https://web.archive.org/web/20201028115553/https:/www.americanprairie.org/bison-harvest (accessed Aug. 10, 2026).

required to wear “hunter orange.”[13]

APF identifies 653 bison transferred to “partner sites” during the organization’s life.[14] Seventy-four of those were transferred to research facilities, zoos, state wildlife departments, national refuges, or interpretive centers. *Id.*

From 2015-2019, APF administered immunocontraceptive vaccines to 192 female bison to prevent pregnancy and manage population growth. Doc. 4 at pdf. p.55. As of 2024, 153 treated females remained in the population. *Id.* at pdf p.56. APF staff estimate only 12% of those females have produced a calf annually since. *Id.*

## ARGUMENT

A party seeking a stay pursuant to 5 U.S.C. § 705, or a preliminary injunction pursuant to F.R. Civ. P. 65, must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm, (3) a balance of equities tipping in their favor, and (4) that injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). “[P]reliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the

---

[13] APF, *2024-2025 Bison Harvest Terms and Rules*, 2 (Aug. 16, 2024), https://web.archive.org/web/20240816003220/https:/americanprairie.org/wp-content/uploads/2024/05/2024_BisonHarvestTermsandRules.pdf (accessed Aug. 10, 2026).

[14] APF, *Contributing to Bison Conservation Nationwide* (June 17, 2026), https://americanprairie.org/project/nationwide-conservation/ (accessed Aug. 10, 2026).

movant, *by a clear showing*, carries the burden of persuasion." *Roe v. Critchfield,* 137 F.4th 912, 922 (9th Cir. 2025) (quotation omitted); *Immigrant Defs. L. Ctr. v. Noem,* 145 F.4th 972, 983 (9th Cir. 2025) (Stay is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant.") (quotation omitted).

Likelihood of success on the merits is a "threshold inquiry", and in its absence, the court need not consider other injunction factors. *Roe*, 137 F.4th at 922 (quotation omitted). This circuit has applied a "sliding scale" under which preliminary injunction can issue "where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor.'" *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-1132 (9th Cir. 2011) (citation omitted). The "serious questions" test is appropriate in cases with factual uncertainties or complexities, *id.* at 1133-35 (discussing Second Circuit's articulation of the test), and is enough to satisfy the first prong ***provided*** the movant also demonstrates a balance of hardships tipping "sharply" in support of injunction and the remaining two factors are met. *Id.* at 1135 (citation omitted); *see also*, *Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*, 98 F.4th 1180, 1191 (9th Cir. 2024).

APF is unable to meet injunction or stay criteria. APF challenges the lawfulness of Defendants' interpretation of the TGA and the adequacy of process under the Administrative Procedures Act. Both are questions of law that are neither factually complex nor in need of further investigation. The *Winter* test applies here. Even if APF presented "serious questions going to the merits," *supra,* APF is unable to demonstrate irreparable harm in implementation of the 2026 BLM Decision, let alone a "balance of hardships" tipping "sharply" in its favor. APF's motion is properly denied.

## I. APF is Not Likely to Succeed on the Merits.

### *A. The 2026 BLM Decision is legally correct.*

#### *1. The 2026 BLM Decision implements the TGA, FLPMA, PRIA, and BLM's own regulations.*

The 2026 BLM Decision is in perfect accord with the TGA, FLPMA, and PRIA. Each of those authorities "***unambiguously reflect*** Congress' intent that the Secretary's authority to issue 'grazing permits' be limited to permits issued 'for the purpose of ***grazing domestic livestock***.'" *PLC v. Babbitt*, 167 F.3d 1287, 1308 (10th Cir. 1999) (emphasis added).

In addition to stopping overgrazing and soil deterioration, and providing for the orderly "use, improvement and development" of land, the TGA's express purpose is "to stabilize the livestock industry dependent on the public range." *PLC*, 529 U.S. at 733 (quoting TGA, Pub. L. No. 73-482, 48 Stat. 1269, 1269

(1934)) (emphasis added). Plaintiff's tout the first two purposes, omitting that critical third purpose (industry stabilization), which has been recognized repeatedly. *Id.*

BLM's regulations mirror the TGA, clearly stating that permits are to be implemented to support the livestock industry. 43 C.F.R. § 4100.0-2(a). There is no need to delve into extensive legislative history or dictionary definitions: the TGA and BLM's regulations are undeniably clear that grazing permits are to enable livestock industry function, and that only occurs when permits issue to production livestock.

FLPMA and PRIA further TGA's purpose, embracing the principle that permits and leases are for "domestic livestock grazing" only. 43 U.S.C. §§ 1752, 1702(p), 1902(a), (c). This is, again, reiterated in BLM's own grazing regulations. *See,* 43 C.F.R. §§ 4130.2, 4130.3, and 4130.3-1. The 2026 BLM Decision correctly notes that the TGA, FLPMA, and PRIA do not define "livestock." BLM's regulations do, however, defining it as "species of ***domestic*** livestock—cattle, sheep, horses, burros, and goats." 43 C.F.R. § 4100.0-5 (emphasis added).

It is also unnecessary to dissect definitions of "domestic" and "livestock" because APF has asserted, continuously over its existence, that its bison are "wild," "rewilded," and not domestic under federal law. These assertions have been made in podcasts, books, depositions, and internal management documents. APF has

managed its bison, with minimal human intervention, with its own consultant stating "there is no risk of domestication" of the herd. Decl. Meredith, Attach. E, at Ex. 8 at 101:12-102:4. Indeed, APF offered to ***donate*** its bison to the Montana Department of Fish, Wildlife and Parks for a wild bison herd "to be managed in the public trust." *Id.*, Attach. E, at Ex. 1 at p.2. As such, the 2026 BLM Decision is clearly correct in denying APF permits.

2. *The 2026 BLM Decision aligns with legal and agency precedent.*

APF incorrectly argues that the 2026 BLM Decision runs afoul of *PLC,* 529 U.S. 728. APF selectively reads *PLC* to mean, as "other stock owners" under the TGA, it is entitled to grazing permits for its conservation bison herd. APF's argument fails.

First, APF is not a "stock owner." The TGA states:

> The [SOI] is hereby authorized to issue or ***cause to be issued permits to graze livestock*** on such grazing districts to such ***bona fide settlers, residents, and other stock owners*** as under his rules and regulations are entitled to participate. . . .

43 U.S.C. § 315b (emphasis added). As noted by the 2026 BLM Decision, "stock" is "tied to commerce, *i.e.*, '[a] merchant's goods that are kept for sale or trade.'" Doc. 1-1 at 3 (citing *Black's Law Dictionary* (12ed. 2024)). APF is not a "merchant" and its bison are not "kept for sale or trade." The only eligibility criteria APF could arguably meet is "resident."

Second, APF confuses ***who*** may obtain a permit (settlers, residents, and stock owners) and ***what*** a permit authorizes (livestock grazing). PLC challenged a 1995 rule eliminating the requirement that entities be "engaged in the livestock business" to be eligible for a grazing permit. *PLC*, 529 U.S. at 745. PLC argued the rule was facially invalid, conflicting with the TGA's provision that "stock owners" are eligible for permits. *Id.* The Supreme Court disagreed, noting that 43 U.S.C. § 315b's eligibility reference to "***stock*** owners," and its later reference to "landowners engaged in the ***livestock business***" receiving a grazing preference, were not necessarily synonymous. *Id.* at 746. While *PLC* may have opened the door to a broader interpretation of who can hold permits, it **did not** hold that grazing permits could issue to a broader class of "stock." To the contrary, 43 U.S.C. § 315b is express that permits may only be issued to "graze livestock."

In addition to misunderstanding *PLC,* APF also asserts that "production" is a new grazing permit standard, never before applied by BLM. Doc. 9 at pdf pp. 21-22. To the contrary, BLM has historically looked at the production status of bison to assess permit propriety under the TGA. Decl. Meredith, Attach. F (*Hampton Sheep Co. v. BLM*, Wyo. 1-74-1 (1975)).

In *Hampton,* the Department of the Interior's Office of Hearings and Appeals (OHA) considered whether bison could be grazed as livestock under the TGA. *Id.* at p.2. The bison were feedlot fed and vaccinated, and Hampton

"intended to utilize [the] buffalo for the production of meat similar to the manner in which cattle are utilized…." *Id.* at pp.4-5. *Hampton* looked at how the bison were managed and their intended use, concluding that they were utilized as other "livestock" would be, consistent with the TGA and other legal authorities. The BLM applied that same standard in the 2026 BLM Decision, albeit to a different fact-driven conclusion.

### ***B. The 2026 BLM Decision rationally terminated APF's grazing permits.***

#### *1. Evidence demonstrates APF's bison are wild, undomesticated, and not for production.*

APF argues that the 2026 BLM Decision irrationally rejected "extensive proof" that its bison are domestic livestock. Doc. 9 at pdf p. 22. APF's representations and actions demonstrate that to be untrue.

Based on its own statements and management documents, APF strives to eliminate domesticity by minimizing or eliminating human interventions like supplemental feed, vaccination, and medication. Decl. Meredith, Attach. E, at Ex. 5 at pp.7-8, 10-11; at Ex. 6 at pp.37-38; at Ex. 7 at pp.259-262; at Ex. 9 at p.4. APF's own consultant testified that given APF's commitment to minimal human intervention, "there is no risk of domestication" of APF's bison. *Id.*, Attach. E, at Ex. 8 at 101:12-102:4. And, rather than market and sell animals for production,

APF manages its population through "contraceptives, harvesting, and/or translocation…." *Id.*, Attach. E, at Ex. 10 at p.2.

As an initial matter, use of contraceptives is foreign to ***production*** operations, for the obvious reason that it inhibits ***production***. Second, APF's canned hunts are no different than a shooting preserve, or what is permitted through a state wildlife agency. These hunts are either donated or given for a nominal fee, and are not production livestock practices. In fact, of those animals harvested (370), only 127 appear to have been for a fee. Remaining harvests (243) appear to have been donated. Doc. 5-3 at pdf p.78 (¶15) and pp.159-174.

Finally, donation to research facilities, tribes, and reserves is not a production livestock operation. Of 653 bison translocated, over 70 have gone to research institutions, zoos, state game and fish departments, national refuges, and interpretive centers.[15] Of the transfers to tribal entities, it is unknown how many are for "conservation" versus harvest.

Twenty-five years of management plans, actions, and public pronouncements showing that APF's bison are rewilded, undomesticated, and not for production purposes undermine the credibility of APF's come-lately claims. APF tries to minimize this history by arguing that because APF's bison are defined

[15] FN 14.

as "domestic" under Montana law, they should be similarly considered in a federal context. Doc. 9 at pdf p. 24. APF's argument finds no legal purchase. The metrics for qualifying as "domestic bison" under Montana statute are based on captivity, taxes, or ownership.[16] Whether animals are "domestic livestock" pursuant to federal law requires broader consideration of how animals are managed and for what purpose. Furthermore, APF has taken every opportunity to distance itself from Montana's statutory definition, demonstrating just how little it deals with actual management.[17] APF's bison are not production livestock.

2. *The 2026 BLM Decision applies the law consistent with facts and past practice.*

APF claims that the 2026 BLM Decision is an impermissible policy shift, failing to meet *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) criteria. However, there was no "policy change" triggering *FCC*. As explained, *Hamilton, supra*, the 2026 BLM Decision was a grazing adjudication consistent with other BLM adjudications. The difference is that BLM concluded APF's bison

---

[16] Montana law defines a "domestic bison" as one that has either been reduced to captivity, been subject to Montana's per capita tax, has never been owned by a person, **or** is the offspring of a bison subject to per capita tax. §§ 81-1-101(4), (6), MCA.

[17] APF, *Bison Management* (Oct. 16, 2020), https://web.archive.org/web/20201016123740/https:/www.americanprairie.org/project/bison-management (APF states that while its herd is "technically" classified by the Montana Department of Livestock, it "manage[s] the animals as wildlife.") (accessed Aug. 10, 2026).

were not domestic, production livestock qualifying for grazing permits. That conclusion, necessitated by the facts, is not a policy shift.

APF asserts its bison were permitted on BLM lands in 2005 and 2008 without "a production requirement…." Doc. 9 at pdf p. 25. APF does not show that BLM considered, or was even aware of, APF's non-production status during those processes. Here, however, the BLM's environmental assessment specifically recognized that APF's bison are "non-production-oriented." Doc. 5-2 at pdf pp. 69, 74, 177. With that recognition, BLM conducted the correct analysis and reached the necessary outcome.

## II. APF Will Not Suffer Irreparable Harm if Injunction is Denied.

To obtain preliminary injunction, APF must establish that irreparable harm is *likely,* not just possible. *Winter,* 55 U.S. at 20. "[S]elf-inflicted wounds are not irreparable injury." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quotation omitted). APF's claims of harm do not warrant injunction.

### *A. Claimed financial harms are speculative and/or not irreparable.*

APF claims the following damages from withdrawing from BLM lands:

- Abandonment of fencing investments made on BLM lands ($350,000)
- 2026 bison harvest cancellation ($25,000)
- Fence construction ($7,000)

Doc. 9 at pdf p. 29. If APF can find replacement leases, it alleges the following expenses:

- Replacement leases ($105,000 annually)
- New fencing and water infrastructure ($200,000)
- Capture, handling, sorting, and shipping ($100,000)
- Hay ($132,960)

*Id.* If APF is instead forced to cull 300 bison,[18] it alleges the following expenses:

- Bison culled ($739,800)
- Calf crop ($184,950 annually)
- Bull acquisition ($100,000)

*Id.*

First, APF's alleged harms are not cumulative. Whether APF chooses to relocate 300 bison ***or*** cull 300 bison eliminates the associated claims.

Second, APF improperly asserts that culling foregoes bison value. If APF culls, it can sell the animal for fair market value. Any decision to donate the animal, at a loss, is APF's. It is also puzzling why APF would cancel its 2026 harvest, an opportunity to recoup associated monies, when it may need to reduce its herd size. Both actions are "self-inflicted wounds." *Al Otro*, 952 F.3d at 1008.

Third, APF's assertion that it will "abandon" $350,000 in fencing is unfounded. Doc. 9 at pdf pp.26, 29. Pursuant to the 2026 BLM Decision, APF still

---

[18] APF will transfer of an unspecified number of bison to three tribal governments, which would reduce the number to be relocated/culled. Doc. 4 at pdf p. 21-22 (¶61).

has grazing permits (and fences) it must utilize, albeit for cattle. Notably, APF fails to recognize revenue associated with these cattle grazing permits, and how that offsets "harm." Whether utilized by APF, or sublet, the BLM permits require cattle grazing to occur.

Finally, claims regarding additional infrastructure, handling and transportation, calf crop, and bull acquisition are entirely speculative. APF provides no quotes regarding any of the foregoing expenses and assumes, without substantiation, that bison calves are worth the same amount as an adult bison. None of the foregoing is supported by evidence beyond Mr. Heidebrink's declaration.

APF's financial claims are overinflated and unsubstantiated, and deliberately ignore sources of revenue. APF fails to demonstrate irreparable harm warranting injunction.

***B. APF's "genetic harm" is mitigable and not irreparable.***

APF claims the loss of genetics as a product of the 2026 BLM Decision. APF claims it has "almost" reached 1,000, the "magic number 'needed for long-term evolutionary potential.'" Doc. 9 at pdf. p. 8 (citing Doc. 4, at Attach. C (¶16) (Putnam Decl.)). APF's claims misunderstand Putnam's statements and the genetic principles at play, overstating proximity to the "magic number."

Putnam refers to "an effective population size" (EPS) of 1,000 to achieve "long-term evolutionary potential," not a total, census population size (CPS) of

1,000. Doc. 4 at pdf. p.36 (¶16); *see also,* EPS definition at Doc. 4 at pdf p.45. The *Population Viability Analysis* (*PVA*) explains this principle and the "100/1000" rule for maintaining evolutionary potential of a population over the long term. *Id.* at pdf. p.71. In short, assuming an EPS/CPS ratio of .1 to .14, a bison herd would require a total, CPS of 7,143-10,000 animals to attain a "magic" EPS of 1,000. *Id.*; *see also* Doc. 4 at pdf. p.36 (¶16). At a total herd size of 940 bison, *id.* at pdf. p.3 (¶6), APF is nowhere near an EPS of 1,000. Indeed, even if APF were to achieve its goal of 5,000 bison, it would ***still*** not achieve an EPS of 1,000. *Id.* at pdf. p.71.

Assuming, *arguendo,* a CPS of 1,000 was the "magic number," APF's 940 bison are maintained in two separate herds, fenced separately, and "are geographically isolated from each other, meaning that bison cannot move from one unit to another on their own." *Id.* at pdf. pp.49-50. As such, APF does not even have a CPS of even 940…it has two herds, with a CPS of 550 and CPS of 400, respectively. *Id.* at pdf. p.3 (¶7). Again, far less than 1,000.

APF claims that reducing its herd by 300, or dispersing into smaller groups would "irreparably harm their genetic health and growth potential." Doc. 9 at pdf p.30.

> Smaller closed herds lose diversity faster, risk negative growth and inbreeding, and ***may*** become perpetually dependent on outside animals; even imported bulls would not ***quickly*** rebuild lost genetic lines, age structure, or reproductive capacity.

*Id.* at pdf p.30-31 (emphasis added). What APF does not acknowledge is that these impacts can be fully mitigated with management. Decl. Michael Honeycutt ¶7 (Aug. 14, 2026). Inbreeding and genetic depression are avoided by introducing and rotating bulls to service herds. *Id.* Even if imported bulls could not "quickly" rebuild lost genetics, as APF claims, Doc. 9 at pdf. p. 31, genetics would ultimately be rebuilt.

APF's claims are especially tenuous, given its herd is comprised of imports from Canada, South Dakota, Iowa, and Montana, "curated" over time. Doc. 4 at pdf. p.12 (¶30). If APF's herd were reduced by 300, the population would be at its 2015 size (620).[19] Between 2015 and 2017, the herd grew 250 animals (to 860). Decl. Meredith, Ex. E, at Ex. 10 at p.3. That growth occurred ***while*** APF was administering contraceptives.[20] Doc. 4 at pdf. pp.55-56. APF offers no credible evidence that it would be unable to build its herd back to the same size and level of genetic diversity, utilizing the same source herds, with even greater speed. Decl. Honeycutt, ¶6.

---

[19] APF, *Bison Restoration* (Dec. 16, 2016), https://web.archive.org/web/20161216164551/https://www.americanprairie.org/project/bison-restoration (last visited Aug. 10, 2026).

[20] It is difficult to lend credence to APF's genetic claims, given previous actions to suppress reproduction.

APF's claimed harms are short-term and/or mitigable. They are not "irreparable harms."

### *C. Claims of "physical harm" are speculative.*

APF's claims of physically harmed are speculative. APF claims that movement "can" cause bison stress, and that transportation "increases the risk" of injuries, mortality, disease, and "operational disruption." Doc. 9 at pdf p.31. These are speculative potentialities insufficient to justify injunction.

Notably, APF's arguments regarding "physical harm" undercut domesticity claims. In briefing, APF tries to portray its bison as "domestic," but then claims that gathering, movement, and transportation may inflict irreparable physical harm. *Compare*, Doc. 9 at pdf pp. 24 and 31-32. Herding, handling, confinement, and transportation are common to domestic livestock husbandry, particularly in the fall months. Decl. Honeycutt at ¶¶4, 5. The fact that APF eschews them undermines any argument that its bison are domestic, production livestock.

## III. The Balance of Harms and Public Interest Both Weigh Against Injunction.

The "balanc[e] of harms" and "public interest" prongs of injunction merge when the government is a party. *Immigrant,* 145 F.4th at 994 (citation omitted). Both tip sharply *against* injunction here. In fact, enjoining the 2026 BLM Decision would implement the 2022 BLM Decision, which is premised on

deficient National Environmental Policy Act (NEPA) analysis and results in unauthorized use of Montana's state trust lands (STL).

APF argues that injunction causes no harm to the BLM allotments in question, citing an OHA order from 2022 denying Montana's petition to stay the 2022 BLM Decision in its appeal, DCHD MT-010-22-02.[21] Doc. 9 at pdf p.32. APF also claims that its bison are "modestly more beneficial" to the economy. *Id.* These hardly tip the "balance of harms" or "public interest" in APF's favor.

APF also asserts that denying an injunction would "harm tribal partners" by limiting APF's ability to supply bison to tribes to "support food sovereignty, culturally significant herd restoration, and hunting opportunities…." *Id.* at pdf p.34. APF's claims are unsubstantiated, vaguely referring to upcoming transfers of unspecified number to unspecified tribes. Doc. 4 at ¶¶57-61. Even if APF identified concrete harm, future transfers would not be precluded, as the remaining herd will continue to reproduce and provide for transfers.

Montana, on the other hand, suffers under injunction. If APF is allowed to exercise permits pursuant to the 2022 BLM Decision, bison will trespass on STL, irreparably harming Montana. "Irreparable harm is established in cases of

[21] *See,* FN 5 of *Brief in Support of Montana's Unopposed Motion for Leave to Intervene.*

continuing trespasses." *U.S. v. Bundy*, 1998 U.S. Dist. LEXIS 23835, *17 (D.C. Nev. 1998) (citations omitted); Doc. 5-2 at pp.95, 99, 102, 105.

The 2022 BLM Decision results in unmitigated bison trespass on STL. *See, Brief in Support of State of Mont.'s Unopposed Mot. for Leave to Intervene* (*Intervention*), 14-16. With the exception of Telegraph, the 2022 BLM Decision allows bison to utilize Box Elder, Whiterock, Flat Creek, French Coulee, and Garey Coulee allotments, including those STL fenced in common. The Montana Department of Natural Resources and Conservation (DNRC) has only authorized APF's bison to use STL in Box Elder and adjacent to Telegraph. It has not authorized bison on STL on Whiterock, Flat Creek, French Coulee, or Garey Coulee allotments.

The federal government gave STL to the State of Montana as a trust for the support of Montana's common schools. Both Governor Gianforte and DNRC have a fiduciary obligation to manage and protect STL on the allotments at issue. Act of February 22, 1889, ch. 180, 25 Stat. 676; Mont. Const. art. X, §11; *In re Powder River Drainage Area* (*Pettibone*), 216 Mont. 361, 366, 702 P.2d 948, 951 (1985); *Montanans for the Responsible Use of the Sch. Tr. v. St.*, 1999 MT 263, ¶¶13-23, 296 Mont. 402, 989 P.2d 800. This obligation requires Montana to administer the trust and manage the land properly and responsibly. *St. ex rel. Thompson v. Babcock*, 147 Mont. 46, 53, 409 P.2d 808, 811 (1966). To this end, Montana's

managerial prerogative ***cannot*** be usurped. *Pettibone*, 216 Mont. at 373, 702 P.2d at 955-56; *Jerke v. St. Dep't of Lands*, 182 Mont. 294, 297, 597 P.2d 49, 51 (1979).

As explained in Montana's intervention briefing, state laws governing STL leases do not currently address or govern bison grazing on those lands. *Intervention* at 15-16; *see also*, § 77-6-507(1), MCA; Admin. R. Mont. 36.25.102(1) and (2).

Unauthorized grazing on STL usurps Montana's managerial prerogative. Trespass on any ground constitutes irreparable injury. *Bundy, supra,* at *17. When that ground is STL, erosion of Montana's fiduciary obligation heightens the irreparable nature.

The public interest also favors preservation of STL and Montana's constitutional prerogative to manage them. The public has an interest in ensuring that the Montana State Board of Land Commissioners "maintain[s] and administer[s] Montana's trust lands in trust for the public…." *Bar K v. U.S.*, 2021 U.S. Dist. LEXIS 138141, *10 (D. Mont. 2021); Mont. Const. art. X, §11. When Montana is rendered unable to make managerial decisions for those lands, the trust suffers against the public interest. *Id.*; *see also*, *Valdez v. Applegate*, 616 F.2d 570, 572–73 (10th Cir. 1980) (public has an interest in exercise of control over state lands.). The public interest is not served when APF's bison graze in disregard of ownership and without authority.

Finally, the public interest is served when the law is implemented. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). Allowing APF's bison herd to graze BLM lands is in excess of legal authority and antithetical to the public interest.

For these reasons, the public interest is best served by denying APF's request for stay.

## CONCLUSION

APF fails to meet the criteria for injunction or stay. APF's motion should be denied.

RESPECTFULLY SUBMITTED this 17th day of August, 2026.

/s/ *Rachel K. Meredith*
Rachel K. Meredith (MSB #11552)
Office of the Governor
1301 E. 6th Avenue
PO Box 200801
Helena, MT 59620-0801
Phone: 406-444-5503
Email: rachel.meredith@mt.gov
*Counsel for Proposed Intervenor-Defendant*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of L.R. 7.1(d)(2)(A), containing 6,499 words (excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and any certificate of service), as verified by the word count feature of Microsoft Word, the word processor that created it.

_*/s/ Rachel K. Meredith*_____

Rachel K. Meredith

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all parties via CM/ECF electronic notice.

*/s/ Rachel K. Meredith*
Rachel K. Meredith