**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

AMERICAN PRAIRIE FOUNDATION,

*Plaintiff*,

vs.

UNITED STATES DEPARTMENT OF INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the United States Department of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and STEVAN PEARCE, in his official capacity as Director of the United States Bureau of Land Management,

*Defendants*.

Cause No. CV-26-282-GF-BMM

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

Plaintiff American Prairie Foundation ("APF") filed a motion for a temporary restraining order and preliminary injunction. (Doc. 6.) American Prairie asks the Court to enjoin Defendants United States Department of Interior ("DOI"), Secretary of Interior Doug Burgum ("Secretary"), United States Bureau of Land Management ("BLM"), and Stevan Pearce (collectively "Federal Defendants"), from cancelling American Prairie's bison grazing permits in Phillips County, Montana. (Doc. 9 at 7-

8.) Defendants and Defendant-Intervenor State of Montana ("Montana") oppose the motion. (Doc. 20, Doc. 19.) The Court held a hearing on August 25, 2026. (Doc. 23.)

**BACKGROUND**

American Prairie owns approximately 940 bison and 8,000 cattle that graze across its leased and deeded properties in the northern plains of Montana. (Doc. 1 ¶¶ 22, 23.) American Prairie has acquired private properties in northcentral Montana for its base property and otherwise enjoys grazing preferences to all allotments at issue in BLM's 2026 Final Decision. (*Id.* ¶ 23.) American Prairie's bison are "privately-owned, domestic bison." (*Id.* ¶ 24, citing BLM Pub. Comment Rep. at A-18 (2022).) Montana law classifies American Prairie's bison as livestock and the bison remain subject to Montana's livestock disease and sanitation laws. (*Id.* ¶ 24, citing BLM Pub. Comment Rep. at A-18 (2022); *see* Mont. Code Ann. § 81-2-702(5).) Federal grazing regulations require American Prairie to "rotate[] and move[] [its bison] through pastures like other livestock authorized on BLM allotments" and it is "required to maintain range improvements, [] manage the bison grazing to meet land health standards," and "manage the bison as a domesticated livestock herd." (*Id.* ¶ 24, quoting BLM Pub. Comment Rep. at A-18 (2022).)

Bison imported by American Prairie or exported to other owners have import permits or transportation permits filed with the Montana Department of Livestock and the United States Department of Agriculture's ("USDA") Animal Plant Health

Inspection Service. (*Id*. ¶ 24.) American Prairie's bison remain confined to specific pastures, tagged for identification, and tested for disease. (*Id*.) American Prairie pays the State of Montana a per capita fee of $6.32 per bison. (*Id*.)

BLM first authorized American Prairie to graze bison on the Telegraph Creek allotment in Phillips County, Montana in 2005. (*Id*. ¶ 25, citing BLM 2026 Final Decision at 2.) BLM approved American Prairie's request to graze bison on the Box Elder allotment in Phillips County, Montana in 2008. (*Id*. ¶ 25, citing BLM 2026 Final Decision at 2.) BLM conducted environmental analyses supporting its decisions to permit bison grazing on these two leases. (*Id*. ¶ 25.) American Prairie has been grazing bison on these two allotments for approximately two decades. (*Id*.)

American Prairie applied for 10-year grazing permits across eighteen allotments, including the Telegraph Creek and Box Elder allotments, on November 20, 2017. (Doc. 20 at 10.) American Prairie revised its application on September 24, 2019, reducing it to seven allotments, still including the Telegraph Creek and Box Elder allotments, in addition to the Flat Creek, Whiterock Coulee, French Coulee, Garey Coulee, and East Dry Fork allotments. (*Id*.; Doc. 1 ¶ 27.) BLM issued an Environmental Assessment ("EA") that showed a Finding of No Significant Impact ("FONSI") for American Prairie's proposed grazing. (Doc. 20 at 10, citing Doc. 5 Ex. 2.) BLM issued a Final Decision ("BLM 2022 Final Decision") authorizing bison grazing and fencing modifications on all the allotments in American Prairie's

application except East Dry Fork, which remained authorized for cattle grazing. (Doc. 1 ¶ 29, citing BLM 2022 Final Decision at 1.) BLM's 2022 Final Decision determined, in part, that American Prairie is eligible to hold permits under the Taylor Grazing Act's ("TGA") qualification requirements that authorize the Secretary of Interior to issue grazing permits to "bona fide settlers, residents, and other stock owners." (*Id.* ¶ 28, quoting 43 U.S.C. § 315b; BLM Pub. Comment Rep. at A-2.)

Montana, alongside the Montana Stockgrowers Association (MSGA) and other livestock interest groups, appealed the 2022 Final Decision to the Department of Interior, Office of Hearings and Appeals ("OHA"), Departmental Cases and Hearings Division ("DCHD"). (*Id.* ¶ 30, citing DCHD Order Denying Stay (Oct. 13, 2022).) The administrative law judge denied their petition to stay, and American Prairie began grazing bison under the 2022 Final Decision shortly thereafter. (*Id.* ¶ 30, citing DCHD Order Denying Stay (Oct. 13, 2022).) Montana and MSGA appealed the DCHD's order denying stay to the Interior Board of Land Appeals ("IBLA"), which affirmed the DCHD's denial of stay. (*Id.* ¶ 30.) Montana appealed the IBLA order denying the stay to the U.S. District Court of Montana. (*Id.*)

BLM defended its 2022 Final Decision and authority to issue bison grazing permits to American Prairie under the Taylor Grazing Act ("TGA") from 2022 to the beginning of 2025. (*Id.* ¶ 31.) The parties had fully briefed the administrative appeals and were waiting for a decision from the DCHD, when BLM filed a motion

for voluntary remand of the 2022 Final Decision without vacatur on February 3, 2025. (Id. ¶ 32.) Before the DCHD ruled on the BLM's remand motion or the pending appeals, the Secretary took the rarely used step of assuming jurisdiction of the administrative appeals on December 9, 2025. (*Id.*; citing OHA Docket Nos. MT-010-22-01, -02, -03 (consol.), Assumption of Jurisdiction Pending Grazing Appeals.)

The Secretary issued an order granting BLM's motion for vacatur without remand and ordering the agency "to take into account the arguments raised in this appeal" and for the agency to "reconsider" its position in the BLM 2022 Final Decision. (*Id.* ¶ 32, citing OHA Docket Nos. MT-010-22-01, -02, -03 (consol.), Order Granting Mot. For Remand at 2.) DCHD dismissed the pending appeals due to the Secretary's remand of the decision back to the agency on December 15, 2025. (*Id.* ¶ 33.) Montana followed by voluntarily dismissing as moot its appeal in federal district court of IBLA's stay decision. (*Id.*)

BLM issued a Notice of Proposed Decision on January 16, 2026, proposing the reversal of its long-held interpretation of TGA and the "cancellation" of American Prairie's grazing permits authorizing bison grazing. (*Id.* ¶ 34., citing 2026 Notice of Proposed Decision.) BLM's 3-page notice stated that its new interpretation of the term "livestock" as referenced in the TGA, meant the agency had the authority to issue grazing permits only in cases "where the animals to be grazed are domestic

and will be used for production-oriented purposes," and "[t]hat would include their being used for their meat, milk, fiber, or other animal products." (*Id*., citing 2026 Notice of Proposed Decision.) BLM concluded it no longer had authority under TGA to issue grazing permits to American Prairie, based on the organization's own public statements related to conservation practices. BLM determined that American Prairie's bison failed to satisfy the agency's new interpretation of the word "livestock." (*Id*., citing 2026 Notice of Proposed Decision.)

BLM received 35 protests of its Proposed Decision, including a protect from American Prairie. (*Id*. ¶ 35, citing BLM 2026 Final Decision.) BLM issued its 2026 Final Decision on May 8, 2026, reaffirming BLM's new position that the terms "live" and "stock," when defined separately, limit the agency's authority to issue grazing permits under TGA to "cases where the animals to be grazed are domestic and will be used for production-oriented purposes." (*Id*. ¶ 36.) BLM terminated American Prairie's permits on six allotments that authorized bison grazing and re-issued them for cattle grazing only. (*Id*. ¶ 40, citing BLM 2026 Final Decision.) BLM's 2026 Final Decision made "no changes" to American Prairie's cattle-only grazing permit for a seventh allotment—East Dry Fork. (*Id*. ¶ 40, citing BLM 2026 Final Decision.) BLM afforded American Prairie less than five months, until September 30, 2026, to remove its more than 900 bison from the federal allotments. (*Id*. ¶ 40, citing BLM 2026 Final Decision.)

BLM proposed new changes to its implementing regulations on May 12, 2026, only four days after the Final Decision. The new regulations would change BLM's grazing regulations to apply a different "production-oriented" standard for all future applicants of grazing permits than it had applied to American Prairie. (*Id.* ¶ 41, citing 91 Fed. Reg. 26852 (May 12, 2026).) BLM's proposed amendment changes the existing policy of requiring an applicant to be *primarily* a production-oriented operation as originally required of American Prairie. *Id.* BLM now proposes to limit grazing permits to "production-oriented livestock," requiring that livestock be "used *as part of an operation* to provide output for various purposes, such as meat, milk, fiber, or other products and any animals when they are being used to assist with management of other animals in connection with such operations (e.g. horses that are used to assist with cattle management)." (*Id.* ¶ 41. citing 91 Fed. Reg. 26852 (emphasis added).) BLM has not yet been finalized the proposed rule. (*Id.* ¶ 41.)

American Prairie filed an administrative appeal of BLM's 2026 Final Decision before OHA, DCHD, on June 4, 2026. (Id. ¶ 42.) Along with the appeal, American Prairie sought a stay of BLM's decision, pursuant to 43 C.F.R. § 4.171(a)(1). (*Id.*) The Secretary, through Deputy Secretary Katherine McGregor, assumed jurisdiction over American Praririe's administrative appeal of BLM's 2026 Final Decision on July 13, 2026, before the DCHD administrative law judge could rule on American Prairie's request for stay. (*Id.* ¶ 43.) The administrative law judge

dismissed American Prairie's administrative appeal on July 14, 2026. (*Id.* ¶ 44.) BLM's 2026 Final Decision remains in effect and final for purposes of judicial review. (*Id.* ¶ 45, citing 43 C.F.R. §§ 4.174(b).)

American Prairie filed this complaint on August 4, 2026. (Doc. 1.) American Prairie filed a motion for preliminary injunction and temporary restraining order on August 4, 2026. (Doc. 6.) Montana filed an unopposed motion to intervene on August 17, 2026. (Doc. 15.) The Court granted Montana's motion to intervene on August 18, 2026. (Doc. 17.) Montana and Federal Defendants oppose American Prairie's motion for preliminary injunction and temporary restraining order. (Doc. 19, Doc. 20.)

## LEGAL STANDARD

District courts enjoy discretion regarding whether to grant or deny a temporary restraining order. *Miss Universe, Inc. v. Flesher,* 605 F. 2d 1130, 1132-33 (9th Cir. 1979); *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). Fed. Rule 65 of Procedure governs preliminary injunctions and temporary restraining orders. The standard for issuing a TRO proves "essentially identical" to the standard for granting a preliminary injunction. *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1154 (D. Or. 2020); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

A plaintiff seeking a temporary restraining order must establish the following four elements: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. The balance of equities and public interest "factors merge when the Government" is the party opposing the preliminary injunction request. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**DISCUSSION**

American Prairie alleges that "BLM's 2026 Final Decision unlawfully adds a 'production-oriented' eligibility requirement to the TGA and arbitrarily reverses decades of practice while ignoring unrebutted evidence that American Prairie's bison are domestic livestock." (Doc. 9 at 17-18.) American Prairie asserts that without relief it will suffer "unrecoverable financial losses, genetic and physical harm to the herds, and damage to its mission." (*Id*. at 18.) BLM argues that its current interpretation advances "the best reading of the TGA, and correctly applies that reading to the bison at issue." (Doc. 20 at 17.) BLM claims that American Prairie suffers no risk of irreparable harm, and fails to demonstrate that it meets the necessary elements for immediate relief. (*Id*. at 30-34.) Montana asserts that the 2026 BLM Final Decision is legally correct and American Prairie is unable to

demonstrate irreparable harm in implementation of the 2026 BLM Final Decision. (Doc. 19 at 18.) The Court will address the *Winter*'s factors in turn.

**I. Whether American Prairie has satisfied the requirements for a preliminary injunction under Fed. R. Civ. P. 65 and *Winter*.**

Before addressing the four factors from *Winter*, the Court notes that the Ninth Circuit has approved application of the serious questions test that requires plaintiffs "to show only a serious question going to the merits instead of a likelihood of success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). "As to the first factor, the serious questions standard is 'a lesser showing than likelihood of success on the merits.'" *Flathead-Lolo-Bitterroot*, 98 F.4th at 1190 (quoting *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). The Ninth Circuit nowhere has limited the serious questions test to cases involving only "factual uncertainties or complexities" as suggested by Montana. (Doc. 19 at 17; *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133-35 (9th Cir. 2011)).

**A. Likelihood of Success on the Merits.**

Congress has passed laws that govern grazing privileges on the public rangelands beginning in 1934. TGA, 43 U.S.C. § 315 *et seq.*, seeks to "promote the highest use of the public lands" and "stop injury" from "overgrazing and soil deterioration." 43 U.S.C. § 315; *see generally Pub. Lands Council v. Babbitt*, 529

U.S. 728, 731-33 (2000). TGA authorizes the Secretary of Interior to divide public rangelands into grazing districts and to issue permits to private parties to graze livestock on the land. TGA's goals "are to 'stop injury' to the lands from 'overgrazing and soil deterioration,' to 'provide for their use, improvement and development,' and 'to stabilize the livestock industry dependent on the public range.'" *Pub. Lands Council*, 529 U.S. at 733 (quoting 48 Stat. 1269).

FLPMA provides additional direction for the management of public lands. "In enacting FLPMA, 'Congress declared that it is the policy of the United States to manage the public lands in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498-99 (9th Cir. 2011) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009)). FLPMA instructs that permits for grazing on public lands ordinarily shall be issued for a 10-year term, subject to such terms and conditions as BLM deems appropriate and consistent with governing law. 43 U.S.C. § 1752(a). FLPMA also establishes that a permittee holding an expiring grazing permit will be given first priority for renewal if the permittee "is in compliance with the rules and regulations issued [by the Secretary] and the terms and conditions of the permit." 43 U.S.C. § 1752(c).

BLM has issued regulations to implement TGA and FLPMA. 43 C.F.R. §§ 4100-4190.1 (2005). BLM issued amended regulations in 2006. Those regulations have been enjoined by a court in the District of Idaho. *See W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008). These amended regulations are not in effect for the relevant BLM field office. BLM's recent proposed changes to the regulations are not final.

American Prairie argues that BLM based its decision to rescind American Prairie's permits on BLM's erroneous interpretation of TGA to limit grazing permits only to operations in which "the animals to be grazed are domestic and will be used for production-oriented purposes." (Doc. 9 at 18.) American Prairie asserts that "BLM's new 'production-oriented' requirement contravenes the 'best reading' of the TGA," and "therefore is 'not in accordance with law.'" (*Id*., citing *Loper Bright Enters.*, 603 U.S. at 400; U.S.C. § 706(2)(A); *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010).) Federal Defendants contend that "a production-oriented purpose is an inherent and defining attribute of both livestock and domestic livestock." (Doc. 20 at 18.)

The Court begins with the statutory text. See *Navajo Nation v. HHS*, 325 F.3d 1133, 1136 (9th Cir. 2003) (en banc) (quoting *Duncan v. Walker*, 533 U.S. 167, 172 (2001)). TGA authorizes BLM to issue grazing leases or permits to "settlers, residents, and other stock owners." 43 U.S.C. §§ 315, 315a, 315b. TGA requires

BLM to give preference with respect to permits to "landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights." § 315b; *see Pub. Lands Council*, 529 U.S. at 745. Federal Defendants cite these sections to argue that "Congress signaled that [TGA's] statutory scheme is oriented toward livestock maintained and grazed for production." (Doc. 20 at 19.) Federal Defendants ignore the U.S. Supreme Court's thorough discussion of these provisions.

The U.S. Supreme Court in *Public Lands Council* specifically discussed the distinctions between "stock owners" and "landowners engaged in the livestock business." *Pub. Lands Council*, 529 U.S. at 746. The U.S. Supreme Court concluded that "no convincing indication" existed to suggest that Congress intended to treat the two terms as synonyms. *Id*. In other words, the U.S. Supreme Court rejected the proposition Federal Defendants and Montana now argue that the language in TGA intended to limit grazing permits to only those engaged in the livestock business, rather than those otherwise owning livestock. The U.S. Supreme Court considered TGA's legislative history and purpose and reasoned that "Congress expected that ordinarily permit holders would be ranchers, who do engage in the livestock business, but does not show any such absolute requirement." *Id*.

The Court finds unpersuasive Federal Defendants' and Montana's attempts to argue otherwise or to distinguish *Public Lands Council*. Federal Defendants

acknowledge that "[i]f all stock owners had to be engaged in the livestock business, the preference for that narrower category would be superfluous." (Doc. 20 at 24.) Montana asserts that though the U.S. Supreme Court may have opened the door to a broader interpretation of patented permit holders, it did not conclude that grazing permits could issue to a broader class of stock. (Doc. 19 at 21.) The Court finds unpersuasive the arguments that the holding of *Public Lands Council* applies only to eligibility, or to specific eligibility, rather than the substance of TGA. This argument fails to meaningfully distinguish the interpretive issues presented in *Public Lands Council* and here.

The Court finds similarly uncompelling Federal Defendants' and Montana's arguments that American Prairie is not "grazing livestock" as required by TGA. The definition of livestock includes American Prairie's bison. Black's Law Dictionary provides the following definition of the word "livestock." "Livestock" means "[f]arm animals; specifically, domestic animals and fowls that (1) are kept for profit or pleasure, (2) can normally be confined within the boundaries without seriously impairing their utility, and (3) do not normally intrude on others' land in such a way as to harm the land or growing crops." Black's Law Dictionary (12th ed. 2024). Federal Defendants make no argument that American Prairie's bison herd fails to qualify as livestock under this definition. Indeed, such an argument would prove uncompelling as American Prairie's bison are domestic animals kept for profit and

pleasure, that are confined within boundaries, and otherwise meet the elements of the definition. Black's Law Dictionary further provides the following definition of "domestic animal:" one that is "customarily devoted to the service of humankind at the place where it normally lives, such as a dog or cat" or one that "is statutorily so designated." Black's Law Dictionary (12th ed. 2024). BLM recognized in its 2026 Final Decision that American Prairie's bison constitute domestic animals under Mont. Code Ann. § 81-1-101(4).

These basic definitions demonstrate that American Prairie's bison qualify as livestock for the purposes of TGA. American Prairie is not attempting to pursue a "conservation permit" as disallowed by *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1307-08 (10th Cir. 1999), *aff'd*, 529 U.S. 728 (2000). The Court further concludes that even if TGA allowed only "production-oriented" livestock grazing, evidence exists that American Prairie meets that condition. "Nearly half of American Prairie's bison have been directly sourced for their meat or sent to other operators for meat production or other valid uses." (Doc. 9 at 23-24, citing Doc. 5 Ex. 3, Cochenour Decl., at 13-14.) "[M]embers of the public have harvested 370 bison, providing approximately 75,000 pounds of meat" since 2016. (*Id*. at 23.) American Prairie has shipped "645 bison to other herds in Montana, Colorado, Nebraska, Arizona, South Dakota, Washington, Washington D.C., Pennsylvania, and Oklahoma to supplement genetics, start food sovereignty programs, increase herd

size, to return an animal of cultural significance to their land, and for hunting and harvesting opportunities." (*Id.*, citing Doc. 4, Heidebrink Decl., ¶¶ 57-59.) These examples present clear evidence of production-oriented practices, regardless of whether American Prairie also exercises practices related to conservation, or otherwise unfamiliar to BLM's undefined "*true* production-oriented operation." *See* BLM 2026 Final Decision at 5 (emphasis added).

No statutory language or judicial precedent exists that requires a livestock operation to focus exclusively on production and entirely ignore conservation, range improvement, preservation, or other values. Montana points to *Hampton Sheep Co. v. BLM*, Wyo-1-74-1 (1975), as possible precedent. (Doc. 19 at 21.) The Department of the Interior's Office of Hearings and Appeals (OHA), in *Hampton*, permitted a herd of 26 immature bison to graze a federal allotment because they were being used as livestock might be. *Hampton Sheep Co.*, Wyo-1-74-1 at 3, 13. The Hampton Sheep Company planned to manage and vaccinate the bison, much like American Prairie's bison. *See Id.* at 5; (Doc. 1-1 at 16.) Montana focuses on the Hampton Sheep Company president's belief the bison may be used for meat, but omit the vice president's comment that "there was only a chance of that." *Hampton Sheep Co.*, Wyo-1-74-1 at 5. The company placed the bison on the allotment "partly as a tourist attraction." *Id.* at 3. OHA nevertheless saw no difficulty in determining the bison

qualified as livestock for the purposes of Section 3 of TGA, and were in substantial respect treated as livestock. *Id.* at 13.

Rather than the "*true* production-oriented purpose," the *Hampton Sheep Co.* decision aligns with TGA's legislative goals: to regulate the occupancy and use of the federal lands, to preserve the land and its resources from injury due to overgrazing, and "to provide for the orderly use, improvement, and development of the range." 43 U.S.C. § 315a. These goals demonstrate that Congress recognized livestock grazing and livestock management often includes and considers preservation, improvement, and thoughtful development, hand-in-hand with other uses.

The Court reviews FLPMA and TGA under APA standards. *See Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013). An agency action proves unlawful under APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). Courts may not defer to an agency interpretation of the law, even if a statute is ambiguous. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). The reviewing court "independently interpret[s] the statute and effectuate[s] the will of Congress subject to constitutional limits." *Id.* at 371.

The Court struggles to see how BLM's decisions both to require production-oriented operations, and to ignore the evidence demonstrating American Prairie's production-oriented bison operation, are not "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law." *Jewell*, 747 F.3d at 601. An agency action proves arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

First, BLM relied on factors—namely a "production-oriented requirement"—that Congress clearly did not intend for it to consider, much less consider as dispositive. *Motor Vehicle*, 463 U.S. at 43. BLM's extra-statutory interpretation violates APA. Second, BLM offered an explanation for its decision—that American Prairie's use of conservation and restoration language was unfamiliar to true production-oriented operations—that ran counter to the evidence before BLM that American Prairie's bison herd are domesticated livestock that provide monetary value and the organization demonstrates production-oriented practices and purposes among its other goals. *Id*. The basic premise behind Federal Defendants' and Montana's arguments is that all livestock owners who want to graze their herd on

BLM lands must comply with all traditional livestock practices and must avoid restorative or otherwise not entirely maximum-profit-oriented motives. This premise remains unsupported by statute or case law.

"The touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 52). The Court finds lacking BLM's reasoning in this decision and determines that American Prairie has demonstrated a likelihood of success on the merits. At the very least, the Court concludes that American Prairie has shown serious questions for the purposes of the Ninth Circuit's sliding scale test. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

"Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.* (citation omitted). Although "[s]erious questions need not promise a certainty of success, nor even present a probability of success, [they] must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)). American Prairie has met this burden. Indeed, American Prairie meets the more stringent standard requested by Montana. (See Doc. 19 at 17.)

The Court declines to address at this time the dispute concerning BLM's change in policy as it proves unnecessary. The Court notes, however, that BLM's

shift in interpretation comes after nearly two decades of practice applying the statute in another manner. *See Abramski v. United States*, 573 U.S. 169, 202-03 (2014) (Scalia, J., dissenting) ("[T]he fact that the agency charged with enforcing the Act read it, over a period of roughly 25 years, not to apply to the type of conduct at issue here is powerful evidence that interpreting the Act in that way is natural and reasonable . . .."); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ("Sometimes [a change] must ['provide a more detailed justification than what would suffice for a new policy created on a blank slate']—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.") (internal citations omitted).

**B. Likelihood of Suffering Irreparable Harm Absent Preliminary Relief.**

To obtain a preliminary injunction "plaintiffs must establish that irreparable harm is *likely*, not just possible . . . " *Cottrell,* 632 F.3d at 1128 (citing *Winter*, 555 U.S. at 22). The Court recognizes that "establishing irreparable injury should not be an onerous task for plaintiffs" *Cottonwood Envt'l. L. Ctr. v. U.S. Forest Service,* 789 F.3d 1075, 1091 (9th Cir. 2015).

American Prairie asserts that it will be forced to cull or transfer approximately 300 bison by September 30, 2026, based on BLM's 2026 Final Decision. (Doc. 9 at 27.) This number amounts to around one-third of American Prairie's bison herd.

American Prairie asserts that it cannot transfer its entire bison herd to its deeded lands because "[m]ost of American Prairie's deeded acreage is unavailable or unsuitable for bison due to cattle leases, inadequate fencing, intermingled lands not approved for bison, and insufficient forage." (*Id*. at 28.) American Prairie contends that "[r]eplacement leases, if available, would cost about $105,000 annually, plus more than $200,000 for fencing and water infrastructure and another $100,000 for capture, handling, sorting, and shipping." (*Id*. at 29.)

American Prairie suggests that the replacement leases are scarce and "[i]f no lease is available, losing 300 bison would cost $739,800 in animal value and $184,950 annually in lost calves." (*Id*.) American Prairie argues that it "would also need to purchase ten bulls over two years at about $100,000, after months of vetting and quarantine" to mitigate resulting genetic harm. (*Id*.) American Prairie already has spent significant amounts of money and "stands to abandon more than $350,000 in bison-specific improvements made in reliance on BLM approvals and spend at least $7,000 more on deeded-land fencing." (*Id*.) American Prairie cancelled its annual public harvest as a result of the decision which "is expected to result in a $25,000 loss this year alone." (*Id*.) American Prairie asserts that "the unplanned $300,000 operational disruption would materially harm American Prairie's financial security and increase 2026 bison-program expenses by about 30 percent." (*Id*.)

American Prairie further asserts genetic harm will occur to its bison herd as a result of BLM's 2026 Final Decision. (*Id*. at 30.) American Prairie cites evidence of the genetic diversity, intentional breeding, and genetic value of its bison herd, and evidence that culling a third of the herd and dispersing the rest of the herd will damage its genetic health and growth potential. (*Id*.) American Prairie argues that "[h]erd size is the single most important determinant of the rate at which a closed bison herd loses genetic diversity." (*Id*., quoting Putnam Decl., ¶ 19.) American Prairie contends that it needs "herds of at least 400 bison and 10,000 contiguous acres to preserve genetic viability, but most deeded lands cannot provide that acreage because of small parcels and checkerboard ownership." (*Id*., quoting Doc. 4, Heidebrink Decl., ¶¶ 19-22.)

Federal Defendants assert that American Prairie cannot prove that it will be forced to cull 300 bison. (Doc. 20 at 31.) Federal Defendants argue that American Prairie's "grazing permits require it to maintain sufficient base property 'to produce crops or forage that can be used to support authorized livestock.'" (*Id*., quoting 43 C.F.R. §§ 4100.0-5(l) (2005), 4110.1(a) (2005), 4110.2-1 (2005).) Federal Defendants claim that American Prairie's "purely monetary injury" cannot demonstrate irreparable injury because it does not "threaten the very existence of the movant's business." (*Id*., quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see Lydo Enterprises v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).)

Federal Defendants cite American Prairie's assets and resources as evidence that the asserted loss does not threaten its operation. (*Id*. at 32.) Federal Defendants additionally argue that American Prairie cannot demonstrate genetic harm to its bison beyond speculation and unsupported allegations. (*Id*. at 34.) Montana makes much the same arguments as Federal Defendants. (Doc. 19 at 25-30.) Montana asserts that American Prairie's financial harms are speculative or not irreparable, that its genetic harm is mitigatable and not scientifically supported, and that any physical harm to the bison proves speculative. (*Id*.; see Ex. 1 Decl. Michael Honeycutt.)

Irreparable harm involves "harm for which there is no adequate legal remedy, such as an award for damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "For this reason, economic harm is not generally considered irreparable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021), *overruled on other grounds by Arizona All. for Retired Americans v. Mayes*, No. 22-16490, 2026 WL 2277101 (9th Cir. Aug. 7, 2026). "But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable." *Id*., citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Federal Defendants' reliance on *Lydo* is misplaced, because, as American Prairie points out, it rests on important underlying factual differences. (Doc. 21 at

13.) In *Lydo*, the city of Las Vegas, Nevada had enforced a zoning ordinance which prohibited "all sexually oriented businesses" from areas within 1,000 feet of any other sexually oriented businesses, churches, schools, parks or playgrounds, or in areas zoned other than C-2, C-M, and M. *Lydo Enterprises*, 745 F.2d at 1212. The plaintiff operated bookstores and theaters that exhibited sexually oriented materials. *Id.* The businesses were deemed a non-conforming use, but the plaintiff obtained a preliminary injunction that the city then appealed. *Id.* The plaintiff's business would be closed without the court's restraint. *Id.* at 1213. The *Lydo* court determined that the plaintiff's loss was purely monetary, because the plaintiff could relocate their business and would need to bear the costs of relocation and some loss of income. *Id.* Although the *Lydo* court did note that "purely monetary injuries are not normally considered irreparable," it also recognized that if "[the plaintiff] ultimately prevail[ed] it may well [have] fully recover[ed] damages for any losses caused by closure of its business." *Id.* Even Federal Defendants have recognized that the same is not true for American Prairie. (Doc. 20 at 25 n.4.)

The Court agrees with American Prairie that it could not pursue damages against BLM, and, therefore, any economic injury it suffers proved noncompensable. This factor suggests that the loss should be the type of financial injury that courts consider irreparable harm. No adequate compensatory or corrective relief will be available from BLM for its cancellation of the leases and impending removal date.

The Court also emphasizes that the analysis focuses on the irreparability of the injury rather than its "magnitude." *Azar*, 911 F.3d at 581 (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). The Court further notes that "[e]conomic damages might also be functionally irreparable if an award would be impossible to quantify and distribute in practice," which could be the case here concerning the genetic diversity claims and harm the genetic health of the herd. *Los Altos Boots v. Bonta*, 562 F. Supp. 3d 1036, 1046 (E.D. Cal. 2021) (citing *Apr. in Paris v. Becerra*, 494 F. Supp. 3d 756, 770 (E.D. Cal. 2020)).

The Court concludes that American Prairie demonstrates concrete injuries that are immediately threatened as opposed to speculative injury. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). This injury is clear and "irreparable" as it cannot "be adequately remedied by money damages and [may be] permanent or at least of long duration." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

**C. Balance of Equities and the Public Interest.**

In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). The balancing of the equities and the public interest factors generally merge when the government is the defendant. *See, e.g.*, *League of Wilderness Defs./Blue Mountains Biodiversity*

*Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Montana asserts that these factors tip sharply in favor of its position because the 2022 BLM Final Decision "results in unmitigated bison trespass on [state trust land ("STL")]." (Doc. 19 at 32.)

Montana law does not address bison grazing on state trust lands. (*Id.* at 33, citing Mont. Code Ann. § 77-6-507(1).) Montana argues that the federal government permitting bison to graze on the STL that is fenced in common with the BLM allotments "usurps Montana's managerial prerogative" over STL. (*Id.*) Federal Defendants assert that it is in the public's interest to carry out the statutory mandate it now espouses. (Doc. 20 at 35, citing *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (courts must respect Congress's policy choices when assessing the public interest)).

The Court first agrees that the public has an interest in agencies respecting Congress's policy choices. Indeed, when the alleged action by the government violates federal law, the public interest factor generally weighs in favor of the plaintiff. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018) ("In addition, the Court again notes the public interest that exists in ensuring that the government complies with its obligations under the law and follows its own procedures." (quotation marks omitted)); *Coyotl v. Kelly*,

261 F. Supp. 3d 1328, 1344 (N.D. Ga. 2017) ("[T]he public has an interest in government agencies being required to comply with their own written guidelines instead of engaging in arbitrary decision making."). The Court already has determined that BLM ignored statutory mandates in TGA and created extra-statutory provisions in its 2026 Final Decision. This conclusion compels a determination that the public's interest lies in granting American Prairie's requested relief.

The Court further finds uncompelling Montana's arguments concerning trespass on STL. Montana argues that it has not authorized bison to graze on the Whiterock, Flat Creek, French Coulee, or Gary Coulee allotments. (Doc. 19 at 32.) American Prairie's bison graze on three allotments. (Doc. 9 at 2; Doc. 20 at 36.) A herd of 550 bison grazes the Telegraph Creek and Box Elder allotments, and a herd of 400 grazes the Whiterock allotment. (Doc. 4 at 2.) The Whiterock allotment remains the only allotment wherein bison are actually grazing and Montana alleges trespass. Bison have been grazing there since 2022. (Doc. 9 at 9.) Montana does not allege any specific instances of trespass at the Whiterock allotment. Montana's alleged harms remain far more speculative than American Prairie's.

The Court finds persuasive American Prairie's citations to BLM records that American Prairie's bison grazing causes no harm to public lands or creates any increased risk of disease transmission. (Doc. 9 at 32-33; *see* Doc. 5 Ex. 7 Cochenour Decl., Attach. G, at 20, BLM Response to Stay; Doc. 5 Ex. 5 Cochenour Decl.,

Attach. E at 22, DCHD Order; Doc. 5 Ex. 6 Cochenour Decl., Attach. F at 13, IBLA Order; Doc. 5 Ex. 7 Cochenour Decl., Attach. G at 9-10, BLM Response to Stay.) The Court also finds compelling American Prairie's discussion of the impact the 2026 Final Decision would have on its tribal partners. (Doc. 9 at 34-35.) The balance of equities tips in favor of American Prairie.

Finally, the Court agrees with Federal Defendants' assertion that the injunction would be overbroad if applied to all six allotments. (Doc. 20 at 28.) An injunction must be "tailored to the remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Food, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). An overboard injunction constitutes an abuse of discretion. *United States v. BNS., Inc.*, 858 F.2d 456, 460 (9th. Cir. 1988). Plaintiffs currently graze their bison on three federal allotments. (Doc. 9 at 2.) Plaintiff's requested relief would enjoin BLM from implementing its 2026 Final Decision and permit American Prairie to graze bison across all six allotments. (Doc. 9 at 29.) The full implementation would encompass three lots where American Prairie's bison do not currently graze. (*See* Doc. 9 at 3; Doc. 4 ¶ 7.) American Prairie's strong showing of success on the merits and serious questions, along with the concrete, irreparable harm it would suffer if relief was denied, weigh in favor of preserving the status quo. Preserving the status quo would not include, however, extending the injunction to the previously ungrazed allotments where American Prairie makes no showing of harm. (Doc. 20 at 28.) The Court

partially will grant American Prairie's motion for a preliminary injunction and temporary restraining order and will address these issues on the merits in the future.

**ORDER**

Accordingly, **IT IS ORDERED** that American Prairie's Motion for Preliminary Injunction and Temporary Restraining Order (Doc. 6) is **GRANTED in part** and **DENIED in part**. The Court grants American Prairie's motion for preliminary injunction and temporary restraining order with respect to the three allotments where American Prairie's bison already graze. This grazing occurs on the following allotments:

- Telegraph Creek
- Box Elder
- Whiterock

(Doc. 4 at 2.)

The Court declines to grant American Prairie's request with respect to the three allotments where American Prairie's bison do not already graze.

DATED this 4th day of September, 2026.

Brian Morris, Chief District Judge
United States District Court